UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :
                                    :
                                    :
              -v-                   :
                                    :                INDICTMENT
                                    :
BERNARD B. KERIK,                   :                07 Cr. 1027
                                    :
              Defendant.            :
                                    :
------------------------------------x

### COUNT ONE

**(Conspiracy to Deprive the City of New York and
its Citizens of Honest Services)**

The Grand Jury charges:

1.    On or about January 5, 1998, BERNARD B. KERIK, the
defendant, was appointed Commissioner of the New York City
Department of Corrections ("NYCDOC"). As the Commissioner of the
NYCDOC, KERIK oversaw and managed all City institutions
established for the care and custody of felons, misdemeanants,
prisoners under arrest and awaiting arraignment, violators of
local laws and ordinances, and, in some instances, witnesses.

2.    On or about August 20, 2000, BERNARD B. KERIK, the
defendant, left his post as the Commissioner of the NYCDOC and
became the Commissioner of the New York City Police Department
("NYCPD"), where he remained until he resigned on or about
January 1, 2002. As New York City's chief law enforcement
officer, KERIK had a duty to prevent crime, detect and arrest

offenders, and enforce and prevent the violation of all laws and ordinances in force in the City.  It was a part of KERIK'S official duties, as both the Commissioner of the NYCDOC and the NYCPD, to interact with other government employees and City officials.

    3.    At all times relevant to this Indictment:

        (a)   "John Doe #1" and "John Doe #2," unindicted coconspirators, were the principals of a number of related companies engaged in the construction and waste management industries ("XYZ").  XYZ, a New Jersey based company, did private, municipal and state work in both New York and New Jersey and sought to do additional public sector projects.

        (b)   "John Doe #3" was an employee of XYZ.

        (c)   The New York City Charter provided that:  "No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant."

        (d)   The New York City Charter further provided that: "No public servant shall accept any valuable gift, as defined by rule of the [New York City Conflicts of Interest Board ("NYCCOIB")] from any person or firm which such public servant

2

knows is or intends to become engaged in business dealings with the city....."

      (e)   The Rules of the NYCCOIB prohibited, among other things, a public servant's receipt of any valuable gift which would "result in ...  using his or her office for private gain..."

      (f)   The New York City Charter ("The Charter") further provided that "[a]ny person who violates [the aforementioned provisions of The Charter] shall be guilty of a [crime] and, upon conviction thereof shall forfeit his or her public office or employment."

      (g)   The Administrative Code of the City of New York ("The Code") required that certain persons, including the heads of all City agencies, file annual financial disclosure reports.

      (h)   The Code further required that financial disclosure report filers disclose in their reports, among other things, "the nature and amount of any income of one thousand dollars or more from each source derived during the previous calendar year;" any "gift, its value and nature, in the aggregate amount or value of one thousand dollars or more from any single source;" and any "outstanding loan in the amount of $1,000 or more."

      (i)   The Code further provided that "any intentional violation of the [aforementioned requirements of The Code],

3

including but not limited to ... failure to include ...
liabilities, and misstatement of ... liabilities [on a financial
disclosure report], shall constitute a [crime] and shall
constitute grounds for disciplinary penalties, including removal
from office."

(j)  At all times relevant to this Indictment, New York
City and its citizens had an intangible right to the honest
services of their public officials.  As a public official for the
City, the defendant BERNARD B. KERIK had a duty to: (i) perform
his official duties honestly and refrain from influence peddling;
(ii) refrain from receiving corrupt and illegal payments designed
to affect the performance of official duties or coax favorable
official action; (iii) refrain from accepting valuable gifts from
those conducting business with or seeking to conduct business
with the City; (iv) disclose conflicts of interest and other
material information in matters that resulted in his direct or
indirect personal gain; and (v) provide complete and accurate
information on his financial disclosure filings.

### Conspiracy

4.  From in or about 1998, through 2006, in the Southern
District of New York and elsewhere, BERNARD B. KERIK, the
defendant, John Doe #1 and John Doe #2, unindicted
coconspirators, together with others known and unknown,
unlawfully, willfully, and knowingly did combine, conspire,

confederate and agree together and with each other to commit offenses against the United States, to wit, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.

### Objects of the Conspiracy

5.    It was a part and object of the conspiracy that defendant BERNARD B. KERIK, and unindicted coconspirators John Doe #1 and John Doe #2, together with others known and unknown, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice to defraud, and to deprive the City of New York and its citizens of their intangible right to the honest services of BERNARD B. KERIK, for the purpose of executing such scheme and artifice and attempting so to do would and did (1) transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes and e-mails, in violation of Title 18, United States Code, Sections 1343 and 1346 and (2) cause matters and things to be delivered by mail and private interstate carrier according to the directions thereon, to wit, correspondence, invoices, prequalification forms and bidding documents, in violation of Title 18, United States Code, Sections 1341 and 1346.

6.    It was a further part and object of the conspiracy that XYZ, John Doe #1, John Doe #2, and others known and unknown gave money and other things of value to BERNARD B. KERIK, and that KERIK, while concealing material information -- namely, XYZ's, John Doe #1's, and John Doe #2's payment and KERIK'S receipt of these material benefits -- would agree to assist and endeavor to assist XYZ through the use of his public office, by, among other things, contacting on XYZ's behalf regulators and other public officials who were considering whether XYZ should be licensed to do business in New York City and awarded municipal-regulated business.

7.    It was a further object of the conspiracy that XYZ obtain licenses, permits, clearances, and approvals to do business with one or more New York City agency or within an industry regulated by New York City.

### Means and Methods of the Conspiracy

8.    Among the means and methods used by BERNARD B. KERIK, John Doe #1 and John Doe #2, and their co-conspirators to achieve the unlawful object of the conspiracy were the following:

### Corrupt Acceptance of Payments

9.    XYZ was under investigation by several government agencies including the New York City Department of Investigation ("NYCDOI"), the New York City Business Integrity Commission ("NYCBIC"), the New York City Trade Waste Commission ("NYCTWC")

6

and the New Jersey Division of Gaming Enforcement ("NJDOGE").
These agencies sought to determine, among other things, whether
the company had ties to organized crime and whether XYZ, its
principals and key employees possessed the requisite integrity to
perform publicly funded or regulated contracts.

10.  In or about late 1998, XYZ enlisted the influence and
assistance of BERNARD B. KERIK in its efforts to convince
regulators that the company had rid itself of mob ties and
otherwise possessed the requisite integrity to perform publicly
funded or regulated contracts.

11.  In or about April and May 1999, BERNARD B. KERIK
advised John Doe #3 that he was purchasing a cooperative
apartment in Riverdale, New York (the "Riverdale Apartment"),
which he planned to renovate and asked for money to pay for the
renovations.

12.  After KERIK purchased the apartment, XYZ arranged and
paid for an architect and an interior designer to redesign and
renovate the apartment.  The design and renovation of the
apartment included demolishing old walls, and constructing new
walls and floors, a new kitchen, new marble bathrooms with a
jacuzzi, and a marble entrance rotunda.  After the design was
complete, XYZ hired and paid a general contractor to renovate
BERNARD B. KERIK'S Riverdale Apartment.  XYZ paid a total of more

than $255,000 to contractors and subcontractors who renovated KERIK'S Riverdale Apartment.

13.  On or about November 17, 1999, February 25, April 13, April 24, May 8, June 21, October 20, and December 5, 2000, XYZ made payments to the general contractor who renovated the Riverdale Apartment as payment for the substantial renovations completed on the apartment.

14.  During the period that BERNARD B. KERIK requested and received these benefits from XYZ, he assisted the company by contacting regulators and other public officials on XYZ's behalf so that XYZ would be permitted to do municipal-regulated business.

15.  In or about late 1998 through early 1999, BERNARD B. KERIK, at a meeting in his NYDOC office, introduced John Doe #3 to "John Doe #4," a private security consultant, as someone who XYZ should hire to provide security and other services.

16.  In or about mid to late July 1999, BERNARD B. KERIK attended a prearranged meeting at a Manhattan restaurant between an official of the NYCTWC, a New York City agency charged with investigating XYZ, and an official of the NYCDOI, to discuss the XYZ investigation.  During the meeting, KERIK questioned the first official's concern that XYZ had mob ties, vouched for John Doe #3 and John Doe #4, and offered to provide John Doe #3's assistance in the NYCTWC's investigation.

17.    Shortly after attending this meeting, BERNARD B. KERIK sent John Doe #3 an email explaining that "I put my reputation and integrity on the line defending whatever [John Doe #3] asked **without question**." (Emphasis in original). Later, in that same email, KERIK complained that he felt like he was on "welfare" as compared to the life-style John Doe #3 lived. He explained that: "I'm walking on eggshells until this apartment is done.  A bullshit $170,000., [sic] I had to beg, borrow and [expletive] for the down payment and I'm still [expletive] over the $5,000. [sic] I need for closing if it happens.  Then the renovations."

18.    In or about August or September of 1999, BERNARD B. KERIK facilitated a meeting between John Doe #3 and NYCTWC Investigators in his NYCDOC Office to discuss the investigation of XYZ.

19.    In or about 1999, BERNARD B. KERIK telephoned the Assistant Commissioner for the NYCDOI who was working in conjunction with the NYCTWC on the XYZ Investigation, and attempted to vouch for John Doe #1, John Doe #2, and XYZ.

### Concealment of the Corrupt Agreement

20.    Because (1) XYZ was being investigated by a number of regulatory agencies who were seeking to determine whether the company had the requisite integrity to perform public contracts, and (2) defendant BERNARD B. KERIK was a high level public official at the time the corrupt payments were made, it was a

9

necessary part of the agreement to conceal the illegal payments from City officials and regulators while XYZ was seeking a determination that the company and its principals possessed the requisite integrity to engage in municipal work.  Those efforts continued until at least through in or about 2005.  KERIK and unindicted coconspirators John Doe #1 and John Doe #2 took the following steps, among others, to conceal the corrupt agreement:

(a)  John Doe #1 and John Doe #2 concealed the payments made by XYZ to contractors working on KERIK'S apartment in the books and records of XYZ by, among other things, allocating the costs of the renovations to other XYZ jobs and overhead accounts and by "bartering," i.e., exchanging services XYZ provided to contractors for services the contractors provided in connection with the renovation of the Riverdale Apartment;

(b)  KERIK deliberately omitted the payments made by XYZ on his behalf from financial disclosure forms he submitted to the NYCDOI and the NYCCOIB;

(c)  KERIK concealed the payments by failing to report them as income on tax returns filed with the federal government;

(d)  John Doe #1 and John Doe #2 concealed the payments by deducting them as business expenses on the XYZ tax return filed with the federal government;

(e)  John Doe #1 and John Doe #2 made false statements on prequalification and background forms submitted to New York City agencies relating to the payments made by XYZ on KERIK'S behalf;

(f)  KERIK, John Doe #1, and John Doe #2 made false statements about, and otherwise failed to disclose, the corrupt payments to federal,

state and local government agencies and officials, a state grand jury, the media and the public;

(g)   KERIK attempted to cause and caused witnesses to make false statements to the NYCDOI and other local law enforcement officials investigating his receipt of corrupt payments, and otherwise attempted to obstruct a state grand jury investigation into his receipt of said payments.

(Title 18, United States Code, Section 1349)

11

## COUNT TWO

### (Mail Fraud - Theft of Honest Services)

The Grand Jury further charges:

21.  The allegations contained in paragraphs one through twenty of this Indictment are repeated and realleged as though fully set forth herein.

22.  From in or about late 1998 through and including 2006, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the City of New York and its citizens of their intangible right to the honest services of BERNARD B. KERIK, and, for the purpose of executing such scheme and artifice and attempting so to do, caused matters and things to be delivered by mail according to the directions thereon, to wit, correspondence, invoices, prequalification and background forms, and bidding documents.

(Title 18, United States Code, Sections 1341, 1346 and 2)

12

## COUNT THREE

### (Wire Fraud - Theft of Honest Services)

The Grand Jury further charges:

23.   The allegations contained in paragraphs one through twenty of this Indictment are repeated and realleged as though fully set forth herein.

24.   From in or about late 1998 through and including 2006, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the City of New York and its citizens of their intangible right to the honest services of BERNARD B. KERIK, and, for the purpose of executing such scheme and artifice and attempting so to do, transmitted and caused to be transmitted by means of wire and radio communications in interstate and foreign commerce signs, signals, pictures and sounds, to wit, correspondence, invoices, prequalification forms, and bidding documents, sent by fax and e-mail.

(Title 18, United States Code, Sections 1343, 1346 and 2)

13

## COUNT FOUR

**(Obstructing or Impeding the Administration of the IRS)**

The Grand Jury further charges:

25.   The allegations in paragraphs one through twenty of this Indictment are repeated and realleged as though fully set forth herein.

26.   In or about January 2002, BERNARD B. KERIK, the defendant, caused the formation of Gryphon Strategic Group, LLC, a Delaware limited liability company ("Gryphon").  KERIK used Gryphon to receive income KERIK earned for speaking engagements, book royalties, and other miscellaneous sources.  Gryphon maintained bank accounts controlled by KERIK.  KERIK was required to report accurately Gryphon's income and expenses on an Internal Revenue Service ("IRS") Form Schedule C ("Profit or Loss from Business") attached to his U.S. Individual Income Tax Return IRS Form 1040.

### Statutory Allegations

27.   Beginning in or about 1999, and continuing thereafter up to and including the date of filing this Indictment, in the Southern District of New York and elsewhere, the defendant, BERNARD B. KERIK, did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the Internal Revenue Laws.

14

## Means and Methods

28.  Among the means and methods by which BERNARD B. KERIK,

the defendant, corruptly obstructed and impeded, and attempted to

obstruct and impede, the due administration of the Internal

Revenue laws, were the following:  over a six year period, from

1999 through 2004, KERIK (1) failed to report in excess of

$500,000 in income received from the sources described below; (2)

provided false information to his accountants; (3) failed to

disclose to his accountants and return preparers substantial

income he had received personally and through Gryphon; (4)

subscribed to and caused to be filed false U.S. Individual Income

Tax Returns, IRS Forms 1040; (5) failed to provide information to

the IRS about a household employee; and (6) structured his

financial transactions to avoid generating documentation which

would have alerted the IRS to the falsity of his tax returns.

29.  Among the items of income BERNARD B. KERIK failed to

report are the following:

> (a)  BERNARD B. KERIK failed to report as
> income approximately $255,000 in illegal
> payments made for his benefit in 1999 and
> 2000 when John Doe #1, John Doe #2, and XYZ
> paid for the renovations of his personally
> owned cooperative apartment as described in
> Counts One through Three.

> (b)  In or about October 2001, while BERNARD
> B. KERIK was the Police Commissioner of the
> City of New York, he approached a New York
> City real estate developer whom he
> anticipated doing business with in the future
> ("John Doe #5") and requested his assistance

15

in locating an apartment situated on the upper east side of Manhattan.  In anticipation of their future business relationship, John Doe #5 located a luxury apartment for KERIK and made monthly rental payments on KERIK'S behalf from December 2001 through December 2003.  The monthly payments in the amount of $9,650 totaled $236,269.36 over the approximately 2 year period. Despite his receipt of this substantial income, KERIK failed to disclose such income to his tax return preparers and failed to report such income on his 2001, 2002, and 2003 U.S. Individual Income Tax Returns.

(c) In or about February 2002, BERNARD B. KERIK, through Gryphon, entered into an agreement with a computer software company to provide consulting services in exchange for a monthly consulting fee of $10,000 and a percentage of the company.  In or about April 2002, the company paid KERIK approximately $20,000.  Kerik failed to disclose the contract and income he received from the company to his return preparer and failed to report such income on his 2002 U.S. Individual Income Tax Return.

(d)  In or about January 2002, BERNARD B. KERIK signed a contract with a book publisher to write a forward for a book.  The publisher paid KERIK a total of approximately $75,953 in fees and royalties over a three year period from 2002 to 2004 in exchange for these services.  Kerik never told his return preparers about the fees and royalties he earned from the book and failed to report such income on his 2002, 2003 and 2004 U.S. Individual Income Tax Returns.

30.  Among the false deductions BERNARD B. KERIK claimed on his U.S. Individual Income Tax Returns are the following:

(a)  In early 2003, BERNARD B. KERIK falsely advised his accountant that he made $80,000 in charitable contributions.  Based on this false information, KERIK'S accountant

16

prepared a false U.S. Individual Income Tax Return deducting those contributions, which KERIK signed and caused to be filed with the IRS.

(b)  In or about early 2004, BERNARD B. KERIK signed and caused to be filed a 2003 New Jersey Resident Income Tax Return which falsely claimed that he resided in New Jersey during the 2003 tax year when he actually lived on the upper east side of Manhattan in an apartment paid for by John Doe #5.  At or about the same time, KERIK caused to be filed a U.S. Individual Income Tax Return for the tax year 2003 which deducted as a business expense a home office that he claimed to have maintained in the state of New Jersey when in fact he did not even live in the state during the 2003 tax year.

31.  During the 2002 and 2003 tax years, BERNARD B. KERIK employed a regular domestic employee, who served as a nanny for his children.  As such an employer, BERNARD B. KERIK was required to report to the IRS the wages he paid to his employee, and was also required to remit to the IRS certain amounts for, among other things, Social Security and Medicare taxes.  BERNARD B. KERIK failed to report and to remit to the IRS any FICA and Social Security and Medicare taxes due and owing for the said employee.

(Title 26, United States Code, Section 7212(a))

## COUNT FIVE

### (Aiding and Assisting in the Preparation of a False and Fraudulent Tax Return)

The Grand Jury further charges:

32.  The allegations contained in paragraphs one through twenty and twenty-six through twenty-nine of this Indictment are hereby repeated and realleged as though fully set forth herein.

33.  On or about April 15, 2001, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, unlawfully, wilfully and knowingly did aid and assist in, and procure, counsel, and advise the preparation and presentation under, the internal revenue laws, a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the tax year 2000, which return, as KERIK then and there well knew, was fraudulent and false as to a material matter in that KERIK failed to report as income the illegal benefits he received from XYZ.

(Title 26, United States Code, Section 7206(2))

## COUNTS SIX AND SEVEN

### (Subscribing to False Tax Returns)

The Grand Jury further charges:

34.   The allegations contained in paragraphs one through twenty and twenty-six through thirty-one of this Indictment are hereby repeated and realleged as though fully set forth herein.

35.   On or about the dates set forth below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, unlawfully, wilfully and knowingly did make and subscribe U.S. Individual Income Tax Returns, Forms 1040, for himself and his wife for the tax years set forth below, which returns contained and were verified by the written declaration of BERNARD B. KERIK that they were made under penalties of perjury, and which returns KERIK did not believe to be true and correct as to every material matter:

| COUNT | TAX YEAR | RETURN FILING DATE | FALSE ITEM(S) |
|-------|----------|--------------------|---------------|
| 6 | 2002 | 4/15/03 | Failure to declare income from: John Doe #5, a computer software company, and a book publisher<br><br>False charitable deduction<br><br>Failure to report wages paid to a regular domestic employee |

| COUNT | TAX YEAR | RETURN FILING DATE | FALSE ITEM(S) |
|---|---|---|---|
| 7 | 2003 | 4/15/04 | False deduction of home office expense<br><br>Failure to report wages paid to a regular domestic employee |

(Title 26, United States Code, Section 7206(1))

### COUNT EIGHT

### (False Statements on a Loan Application)

The Grand Jury further charges:

36.  The allegations contained in paragraphs eleven and seventeen of this Indictment are repeated and realleged as though fully set forth herein.

37.  At all times relevant to this Indictment, the National Community Bank, ("NCB") was a bank the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

38.  From on or about April 20, 1999 through on or about May 4, 2000, "John Doe #6," a Manhattan realtor who conducted businesses requiring various approvals from New York City, made a personal loan of a total of $28,000 to BERNARD B. KERIK ("the John Doe #6 loan").  The John Doe #6 loan was repaid on or about October 28, 2003.

39.  In or about September 1999, in the Southern District of New York, BERNARD B. KERIK, the defendant, unlawfully, willfully and knowingly did make a false statement and report for the purpose of influencing in any way the action of an institution, the accounts of which were insured by the FDIC, upon an application, purchase, purchase agreement and loan, to wit:  In September of 1999, BERNARD B. KERIK, the defendant, applied for a home mortgage loan from NCB in order to purchase the Riverdale Apartment.  Through a mortgage broker, KERIK falsely represented to the bank that two checks deposited to his bank account were

21

wedding gifts when, as KERIK well knew, they were proceeds from the John Doe #6 loan.  KERIK also signed and caused to be submitted to the bank a uniform residential loan application, wherein he failed to disclose as a liability as required the John Doe #6 loan, and wherein he stated that no part of the down payment for the purchase of the apartment had been borrowed when, as KERIK well knew, he had paid for the down payment with proceeds from the John Doe #6 loan.

(Title 18, United States Code, Section 1014)

## COUNTS NINE THROUGH FOURTEEN

### (False Statements to the Federal Government)

The Grand Jury further charges:

40.  The allegations contained in paragraphs one through twenty, twenty-eight(B), thirty-one, and thirty-seven through thirty-eight this Indictment are repeated and realleged as though fully set forth herein.

41.  From between late 2002 through late 2004, defendant BERNARD B. KERIK sought several positions with the Federal Government, including (1) a position on the Academe & Policy Research Senior Advisory Committee to the President's Homeland Security Advisory Council, (2) Senior Policy Advisor to the Interior Minister of the Coalition Provisional Authority, and (3) the Secretary of the U.S. Department of Homeland Security.  These positions involved vital national security interests and KERIK was required to answer written and oral questions about his background, including questions about his financial dealings, during his vetting for the aforementioned positions.

42.  On or about June 13, 2003, "John Doe #7," a Brooklyn businessman, made a personal loan of $250,000 to BERNARD B. KERIK ("the John Doe #7 loan").  As KERIK well knew, John Doe #7 obtained the funds with which to make the loan to KERIK by in turn taking a loan from "John Doe #8," a wealthy Israeli industrialist whose companies did business with the federal government.  The John Doe #7 loan was repaid on June 10, 2005.

23

43.  On or about the dates set forth below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact, and did make, materially false, fictitious and fraudulent statements and representations, including, among others, the following:

| COUNT | APPROXIMATE DATE | DOCUMENT OR OFFICIAL | FALSE STATEMENT |
|---|---|---|---|
| 9 | 10/29/2002 | White House Official A | KERIK stated he did not have a household employee for whom he did not withhold appropriate federal and state taxes. |
| 10 | 10/29/2002 | White House Official A | In response to a question that called for such information, KERIK failed to disclose: (1) his relationship with John Doe #1, John Doe #2, and John Doe #3; (2) the benefits he received from John Doe #1, John Doe #2, and XYZ; (3) the fact that he had committed a crime by failing to disclose (a) the above benefits, and (b) the John Doe #6 loan, on financial disclosure reports required by New York City; and (4) the fact that he had filed a false loan application with a federally insured bank and had committed a crime by doing so. |

| COUNT | APPROXIMATE DATE | DOCUMENT OR OFFICIAL | FALSE STATEMENT |
|---|---|---|---|
| 11 | 12/19/2002 | Response to Personal Data Statement Questionnaire from the Office of Counsel to the President | KERIK stated he had no household employees on a regular basis. |
| 12 | 12/19/2002 | Response to Personal Data Statement Questionnaire from the Office of Counsel to the President | In response to a question that called for such information, KERIK failed to disclose: his relationship with John Doe #1, John Doe #2, and John Doe #3 and the benefits he received from John Doe #1, John Doe #2, and XYZ. Instead, he stated that he had no questionable business affiliations. |
| 13 | 12/19/2002 | Response to Personal Data Statement Questionnaire from the Office of Counsel to the President | In response to a question that called for such information, KERIK failed to disclose: (1) his relationship with John Doe #1, John Doe #2, and John Doe #3; (2) the benefits he received from John Doe #1, John Doe #2, and XYZ; (3) the fact that he had committed a crime by failing to disclose (a) the above benefits and (b) the John Doe #6 loan on financial disclosure reports required by New York City; and (3) the fact that he had filed a false loan application with a federally insured bank and had committed a crime by doing so. |

| COUNT | APPROXIMATE DATE | DOCUMENT OR OFFICIAL | FALSE STATEMENT |
|-------|------------------|----------------------|-----------------|
| **14** | 10/28/2003–11/24/2003 | OGE Form 450 (Executive Branch Confidential Financial Disclosure Report) | KERIK failed to disclose as required the John Doe #7 loan. |

(Title 18, United States Code, Section 1001)

## COUNTS FIFTEEN AND SIXTEEN

### (False Statements to the Federal Government)

The Grand Jury further charges:

44. The allegations contained in paragraphs one through twenty and forty-one through forty-two of this Indictment are repeated and realleged as though fully set forth herein.

45. On or about the dates set forth below, in the District of Columbia and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact, and did make, materially false, fictitious and fraudulent statements and representations, including, among others, the following:

| COUNT | APPROXIMATE DATE | DOCUMENT OR OFFICIAL | FALSE STATEMENT |
|---|---|---|---|
| 15 | 12/5/2004 | email to White House Official B | KERIK made various false and misleading statements about his relationship with John Doe #1, John Doe #2, and XYZ. |
| 16 | 11/17/2004-12/3/2004 | White House Official C | In response to questions that called for such information, KERIK failed to disclose: his relationship with John Doe #1, John Doe #2, and John Doe #3 and the benefits he received from John Doe #1, John Doe #2, and XYZ. |

(Title 18, United States Code, Section 1001)

## FORFEITURE ALLEGATION

46.  As the result of committing the conspiracy, mail fraud and wire fraud offenses in violation of Title 18, United States Code, Sections 1341, 1343, 1346 and 1349, alleged in Counts One through Three of this Indictment, BERNARD B. KERIK, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to at least $255,000 in U.S. Currency and all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at [REDACTED].

## Substitute Asset Provision

47.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:  (a) cannot be located upon the exercise of due diligence;  (b) has been transferred or sold to, or deposited with, a third person;  (c) has been placed beyond the jurisdiction of the Court;  (d) has been substantially diminished in value;  or (e) has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property, including but not limited to the following: all that lot or parcel of land, together with its buildings, appurtenances,

28

improvements, fixtures, attachments and easements, located at

**[REDACTED]**.

(Title 18, United States Code, Section 981 and
Title 28, United States Code, Section 2461)


_____          _____
GRAND JURY FOREPERSON                MICHAEL J. GARCIA
                                     United States Attorney