**U.S. Department of Justice**



*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York  10601*

November 29, 2007

**BY HAND**
Honorable Stephen C. Robinson
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York  10601

> Re:  ***United States v. Bernard B. Kerik,***
>      **07 Cr. 1027 (SCR)**

Dear Judge Robinson:

We write to bring to the Court's attention potential and likely actual conflicts of interest posed by the continued participation of Kenneth Breen, Esq. as the defendant's counsel in this case and to seek appropriate relief.

Based upon information now available to the Government, it appears that:  (1) the defendant engaged in concerted efforts to obstruct an investigation of closely-related charges in the Bronx; (2) the defendant made critical non-privileged admissions to Breen; and (3) the aforesaid admissions are evidence of the defendant's endeavors to obstruct justice and are otherwise relevant to the charges in this Indictment.  Mr. Breen's dual role as witness and advocate poses serious conflicts of interest. Accordingly, we respectfully request that the Court take certain remedial action, as more fully set forth below.

**Relevant Facts[1]**

**A.    The Pending Federal Indictment**

On November 8, 2007, the Grand Jury returned a sixteen count Indictment charging the defendant with a variety of

---

[1] We present here a summary of the relevant facts that are known to us through witness interviews, conversations with Mr. Breen, a review of pertinent documents, and statements attributed in media reports to the defendant and the defendant's counsel in a civil suit.

offenses.  Counts One through Three charge that The defendant conspired to and did engage in a scheme to defraud the City of New York of his honest services in violation of Title 18, United States Code, Sections 1341, 1343, 1346 and 1349, by receiving repeated and concealed payments from an alleged mob-linked company seeking to do business with the City of New York ("the Company") while taking official action on the Company's behalf.

While the defendant served as the Commissioner of Corrections and later Police Commissioner, the Company paid for over $255,000 worth of renovations to an apartment the defendant recently purchased in Riverdale, New York ("the Riverdale Apartment").  At the same time he received these illegal benefits, the defendant took official action to assist the Company in doing business with the City of New York.  The defendant and the principals of the Company concealed the illegal payments in a variety of ways in including:  (1) creating false entries in the books and records of the Company designed to conceal the payments; (2) submitting false financial disclosure and prequalification forms to City agencies which concealed the payments; (3) filing false tax returns that failed to disclose the payments; (4) making false statements to City investigators, prosecutors and a state grand jury investigating the scheme; and (5) making false statements concerning the scheme to White House Officials who were vetting the defendant for important positions in the Executive Branch of the Government.

Counts Four through Seven charge that the defendant obstructed the due administration of the Internal Revenue Service ("IRS"), caused the creation of a false tax return, and subscribed to false tax returns in violation of Title 26, United States Code, Sections 7206(1), 7206(2) and 7212(a).  As charged in the Indictment, the defendant failed to report substantial income, took false deductions, and failed to report wages paid to or pay payroll taxes for a domestic employee.  Among the items of income the defendant failed to report are the illegal payments made by the Company on his behalf as charged in Counts One through Three.

Count Eight charges that the defendant made a false statement on a loan application submitted to an FDIC insured lender in violation of Title 18, United States Code, Section 1014.  As charged in the Indictment, the defendant falsely told a bank that no part of the down payment he used to purchase the Riverdale Apartment was borrowed when in fact he had received a concealed loan from a Manhattan realtor who conducted business in New York City ("the Realtor") and used those funds to purchase the apartment.

Counts Nine through Sixteen of the Indictment charge that the defendant made false statements to the Executive branch of the Federal Government in violation of Title 18, United States Code, Section 1001 in connection with various official positions which he sought and\or held between 2002 and 2004.  The Indictment charges that the defendant lied about a number of material financial matters including his relationship with the Company referred to in Counts One through Three and the loan he received from the Realtor charged in Count Eight.

As discussed more fully below, Mr. Breen's conflict arises from the circumstances surrounding his representation of the defendant in an investigation conducted by the New York City Department of Investigation ("NYCDOI") and the Bronx County District Attorney's office ("BCDAO").

## B.  The Bronx Investigation

During the fall of 2004, at or about the time of the defendant's nomination to be Secretary of the United States Department of Homeland Security, the NYCDOI and the BCDAO were pursuing an investigation into allegations that included the defendant's receipt of the benefits charged in Counts One through Three and the concealed loan he received from the Realtor described in Count Eight.  The defendant personally obstructed that investigation by causing patently false statements to be made to the BCDAO on his behalf -- as set forth more fully below -- and by causing at least four witnesses to provide false information to investigators.  Additionally, the defendant's co-conspirators -- owners of the Company -- ultimately impeded the investigation by testifying before the Bronx Grand Jury and falsely denying that they had arranged and paid for the lavish renovations to the Riverdale Apartment.

Shortly after the defendant's nomination was withdrawn in early December of 2004, Joseph Tacopina, Esq., who was then representing the defendant in connection with the BCDAO/NYCDOI investigation, met with representatives of the BCDAO to discuss some of the allegations it was investigating.  In substance, and in pertinent part, Tacopina told the BCDAO and the NYCDOI that the defendant had paid for all of the renovations to the Riverdale Apartment himself and that the total amount of the renovations he had paid for was approximately $50,000.  Tacopina also told the BCDAO that the defendant had taken a loan from the Realtor in the amount of $32,000 in order to make a downpayment on the purchase of the Riverdale Apartment and that the loan was repaid in the year 2003.  The information that Tacopina conveyed to the BCDAO had been provided to him by the defendant for the

3

express purpose of conveying it the Bronx prosecutors conducting the investigation.

In or about the summer of 2005, Mr. Breen joined Mr. Tacopina in representing the defendant in connection with the BCDAO/NYCDOI investigation. Over the course of the next year, the defendant repeated to Tacopina and Breen the substance of what he had earlier told Tacopina (*see supra*) for the express purpose of conveying such information to the Bronx prosecutors conducting the investigation, and Tacopina and Breen met with the Bronx prosecutors on a number of occasions to discuss the case.

In March 2006, after obstructing the investigation for over a year, the defendant instructed his then-attorneys -- Messrs. Tacopina and Breen -- to convince the BCDAO to end its investigation without bringing criminal charges based on, among other things, the supposed expiration of the statute of limitations during the pendency of the investigation.

On June 30, 2006, the defendant pleaded guilty to two misdemeanor charges in the Bronx, one involving a violation of the New York City Administrative Code and the other involving a violation of the New York City Charter. The defendant was represented by Messrs. Tacopina, Breen, and Paul DeMilia at the guilty plea proceeding. During his guilty plea allocution, a copy of which is attached hereto as Exhibit 1, the defendant admitted, among other things, that: (1) between August 1998 and December 2000, while a New York City Commissioner, he accepted $165,000 worth of renovations to the Riverdale Apartment from the Company knowing that Company intended to engage in business dealings with the City of New York, spoke to City officials about the Company on two occasions, and on a third occasion permitted his office to be used for discussions between officials of the New York City Trade Waste Commission ("NYCTWC") and a representative of the Company and (2) he failed to disclose on his required annual financial disclosure reports with the City that he had $28,000 in outstanding loans from the Realtor, $20,000 from 1999 and $8,000 from 2000.

The defendant was sentenced on the same day he entered his plea -- without a probation report. The Court imposed a sentence of fines and penalties totaling $206,000 pursuant to an agreed upon plea arrangement.

After his plea and sentence, the defendant publically claimed that there was no factual basis for his plea. According to *Best Magazine*, as recently as June 20, 2007, Kerik boasted that he had pleaded guilty to the misdemeanor violations because

4

"[he] just f-ing wanted [the case] to be over. I didn't take the pleas because I really thought I had done anything wrong.  It was just, pay the f-kin' fine, give 'em their pound of flesh, whatever the f-k they want."

## C.    The Federal Investigation

Commencing in or about July 2006, this Office began a grand jury investigation into several allegations relating to the defendant's conduct, including allegations related to the matters to which the defendant pleaded guilty in the Bronx.  Initially both Mr. Tacopina and Mr. Breen jointly represented the defendant in connection with the federal investigation.  In or about April 2007, Tacopina withdrew from the matter and Breen represented the defendant during the federal grand jury investigation that preceded the instant Indictment.

During the federal investigation, Mr. Breen stated to the Government on a number of occasions that he provided most of the legal representation during the Bronx investigation and that Mr. Tacopina, who was the defendant's personal friend and business partner, was not even paid for the minimal legal services he provided.

By letter dated March 30, 2007, the Government advised Mr. Breen as follows:

> ... you mentioned during one of our discussions that you represented Mr. Kerik during the investigation that was conducted by the Bronx District Attorney's office and the New York City Department of Investigation.  As you know, Mr. Kerik's conduct during that investigation is the subject of the current federal investigation and we understand based on our discussions that you will be representing Mr. Kerik in this case.  We do not know at this stage whether you will be a witness in this case or whether your prior representation of Mr. Kerik poses any conflict with respect to your representation in this case.  We trust that if you determine that there is a conflict, you will withdraw from your representation of Mr. Kerik.  Of course, we must reserve the rights of the United States to raise the conflict issue with the Court at a later date in the event it becomes necessary to do so.

> We raise this issue now so that you may consider the
> matter, not to suggest that your withdrawal is
> necessary.

Breen never responded to the above-quoted portion of the letter
and never discussed the withdrawal issue with us until after we
raised it with him anew within days of the defendant's
arraignment on the instant Indictment.[2]

## D.   **The Fulbright & Jaworski Lawsuit**

When he was originally retained to represent the
defendant in connection with the Bronx matter, Mr. Breen was a
member of the firm of Fulbright & Jaworski.  Breen subsequently
left that firm and became a member of the New York Office of
Paul, Hastings, Janofsky and Walker.  About two weeks prior to
the return of the Indictment, Fulbright & Jaworski sued the
defendant in New York State Supreme Court for approximately
$200,000 in legal fees it is owed but which the defendant has not
paid.  Included in the lawsuit is a claim of "unjust enrichment."
According to the *New York Times*, the attorney for the defendant
in this civil suit has referred to the dispute as "the result of
an obvious miscommunication" and has suggested that Fulbright &
Jaworksi (and presumably Breen) billed the defendant for work
that the defendant had not, and never would have, authorized.

### Pertinent Governing Authority On Attorney Conflicts

Where a District Court has been informed of the
possibility of a defense counsel's conflict of interest, it has a
threshold obligation "to investigate the facts and details of the
attorney's interests to determine whether the attorney in fact
suffers from an actual conflict, a potential conflict, or no
genuine conflict at all."  *United States v. Levy*, 25 F.3d 146,
153(2d Cir. 1994); *see also United States* v. *Jones*, 381 F.3d 114,
119 (2d Cir. 2004); *United States* v. *Kliti*, 156 F.3d 150, 153 (2d
Cir. 1998).  If a court determines that defense counsel has an
actual or potential conflict, the court has a "'disqualification/
waiver' obligation" to determine whether the conflict is so

---

[2]Other than bringing the conflict issue to Breen's
attention, there is precious little the Government could have
done in this regard during the grand jury investigation.  The
defendant, pre-arrest and pre-indictment, had no right to counsel
at all -- let alone conflict-free counsel -- and none of the
considerations at issue now (*see infra*) adhered before the
defendant was indicted.

severe as to obligate the court to disqualify the attorney or a lesser conflict that can be waived in a *Curcio* hearing. *Kliti*, 156 F.3d at 153; *see also Jones*, 381 F.3d at 119-20; *Levy*, 25 F.3d at 153. An actual conflict is one that is so "severe" that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation." *Levy*, 25 F.3d at 153. Where a conflict of interest is actual, a court is "obliged" to disqualify the attorney. *Id.* A potential conflict of interest, by contrast, is a "lesser" conflict. *Id.* A potential conflict exists where a court finds that "a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation." *Id.*

A defendant has a right under the Sixth Amendment to conflict-free legal representation. *See United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). While the Sixth Amendment encompasses a defendant's right to be represented by the attorney of his choice, the essential aim of the Sixth Amendment's right to counsel is to ensure an effective advocate for all criminal defendants. *Wheat v. United States*, 486 U.S. 153, 159 (1988). Thus, a defendant's right to the lawyer of his choice is not absolute, and the Court is not required to accept a defendant's waiver of his lawyer's conflict of interest. *United States v. Arrington*, 867 F.2d 122, 128 (2d Cir. 1989).

"Standing alone, becoming an unsworn witness is a basis for disqualification of an attorney." *Ciak v. United States*, 59 F.3d 296, 304-305 (2d Cir. 1995); *see Jones*, 381 F.3d at 121 ("If [the defense attorney] turns out to be an actual or unsworn witness in defendant's trial, this would be actual grounds for disqualification"); *United States v. McKeon*, 738 F.2d 26, 35 ("[D]isqualification will occur where the presence of counsel will taint the trial ... Such a taint occurs where counsel assumes a role as an unsworn witness whose credibility is in issue"). Indeed, because the Government, not the defendant, is prejudiced when an attorney is an unsworn witness, "waiver is ineffective in curing the impropriety in such situation." *Locascio*, 6 F.3d 924, 931-34 (2d Cir. 1993).

Moreover, the Code of Professional Responsibility as enacted in New York State's Judiciary Law generally forbids lawyers acting as advocates and witnesses in the same matter. Under the Code, a lawyer is generally forbidden from acting as an advocate where she knows or it is obvious that she ought to be called as a witness on a significant issue on behalf of a client. *See* DR 5-102 (A) [22 NYCRR § 1200.21]. And, if after undertaking employment in contemplated or pending litigation a lawyer learns or it is obvious that the lawyer "may be called as a witness on a

7

significant issue other than on behalf of his client, the lawyer
may continue the representation until it is apparent that the
testimony is or may be prejudicial to the client at which point
the lawyer ... *must withdraw from acting as an advocate before
the tribunal.*"  DR 5-102(D) (emphasis supplied).[3]

        Additionally, "[f]ederal courts have an independent
interest in ensuring that criminal trials are conducted within
the ethical standards of the profession and that legal
proceedings appear fair to all who observe them," *Wheat*, 486 U.S.
at 160.  And, consequently, "[n]ot only the interest of a
criminal defendant but the institutional interest in the
rendition of just verdicts in criminal cases may be jeopardized
by unregulated ... representation."  *Id.*  In *Wheat*, where the
denial of a defendant's motion to substitute as his counsel a
lawyer who represented a co-defendant who had pleaded guilty was
upheld on appeal -- despite the defendant's purported waiver of
his preferred attorney's conflict -- the Supreme Court stated:

            Unfortunately for all concerned, a district
            court must pass on the issue whether or not
            to allow a waiver of a conflict of interest
            by a criminal defendant not with the wisdom
            of hindsight after the trial has taken place,
            but in the murkier pre-trial context when
            relationships between parties are seen
            through a glass, darkly.  The likelihood and
            dimensions of nascent conflicts of interest
            are notoriously hard to predict, even for
            those thoroughly familiar with criminal
            trials.  It is a rare attorney who will be
            fortunate enough to learn the entire truth
            from his own client, much less be fully
            apprised before trial of what each of the
            Government's witnesses will say on the stand.
            A few bits of unforeseen testimony or a
            single previously unknown or unnoticed
            document may significantly shift the
            relationship between multiple defendants.
            These imponderables are difficult enough for
            a lawyer to assess, and even more difficult

--------

        [3]While federal courts are not bound by the New York Code of
Professional Responsibility, *see Bottaro v. Hatton Associates*,
680 F.2d 895, 896-97 (2d Cir. 1982), the Code provides "guidance
on issues of professional conduct."  *Paretti v. Cavalier Label
Co.*, 722 F.Supp. 985, 986 (S.D.N.Y. 1989).

> to convey by way of explanation to a criminal
> defendant untutored in the niceties of legal
> ethics.  Nor is it amiss to observe that the
> willingness of an attorney to obtain such
> waivers from his clients may bear an inverse
> relation to the care with which he conveys
> all the necessary information to them.
>
> For these reasons we think the district court
> must be allowed substantial latitude in
> refusing waivers of conflicts of interest not
> only in those rare cases where an actual
> conflict may be demonstrated before trial,
> but in the more common cases where a
> potential for conflict exists which may or
> may not burgeon into an actual conflict as
> the trial progresses.

*Id.* at 162-63.

Finally, while this Court has broad discretion under *Wheat* to disqualify an attorney based on nascent potential conflicts presented at the beginning of a criminal litigation, should the Court fail to disqualify counsel and an appellate court find post-conviction that counsel should have been disqualified, it will reverse the conviction even in the face of a *Curcio* hearing where the defendant purported to waive the conflict.  *See United States v. Schwarz*, 283 F.3d 76 (2002).

## Argument

It is the Government's current intention to call Mr. Tacopina as a trial witness to testify both as to the false exculpatory account of the renovations to the Riverdale Apartment that were initially conveyed to him by the defendant and that he in turn conveyed to the BCDAO (namely, that the defendant alone paid for the renovations to the Riverdale Apartment and that they cost approximately $50,000) and the admission the defendant made concerning the Realtor's loan (namely, that he took a loan from the Realtor to make the downpayment on the Riverdale Apartment). In order to develop further and corroborate this testimony, we will naturally inquire about the defendant's subsequent repetition of these statements to Messrs. Breen and Tacopina. These statements are not privileged because:  (1) they were intended to be communicated -- and already were communicated in substance -- to the BCDAO and (2) because -- to the extent they related to the apartment renovations -- they were part of an ongoing obstruction of the BCDAO's investigation.  The Government

may subpoena Breen for these purposes, in which case he would be an actual witness. But even in the absence of such a subpoena, he would be an unsworn witness. And, Breen would be a witness -- sworn or unsworn -- not to tangential or peripheral facts, but to facts that go to the heart of many of the charges in the Indictment. Indeed, as to Count Eight -- the false loan application count -- the defendant's admissions to Tacopina and Breen are tantamount to a confession.

Additionally, the defendant is embroiled in litigation involving Mr. Breen's legal fees that further complicates Breen's position here. Should Breen call any character witnesses to testify to the defendant's integrity, the Government would have more than a good-faith basis for cross-examining such witnesses about the defendant's refusal to pay for the substantial costs of his legal representation, which refusal resulted in his unjust enrichment. Likewise, the defendant himself could properly be cross-examined about such issues as they go to credibility, motive, intent and the like. Such questioning would once again put Breen in the role of an unsworn witness.[4]

In short, while no one can predict the future -- which is precisely why the Supreme Court in *Wheat* granted broad discretion to District Courts to nip nascent conflicts in the bud by disqualifying potentially conflicted counsel -- it is clear that Mr. Breen's representation is likely to become a significant issue at trial even if he is not an actual witness (which, as set forth above, he very well might become). Breen, for example, may seek to cross-examine his former co-counsel, Mr. Tacopina, on one or more aspects of his testimony, *i.e.*, he may dispute that the defendant authorized the false proffer or that the false statements were even made. Or, more likely, he may dispute that the state investigation was at all obstructed. He will inevitably have to advise the defendant on whether he should testify on his own behalf. Should the defendant testify, Breen will be forced to make judgement calls about what answers he may properly elicit on direct examination (or redirect) about the defendant's role in obstructing the state investigation. Given that Breen was the primary attorney in the prior investigation -- indeed, the only one who was even formally paid -- his defense of his client's conduct in that investigation will necessarily

---

[4] Apart from the aforementioned considerations, Breen's financial and personal interests in the fee litigation may be adverse to the defendant's and may thus require Breen's disqualification under the Code of Professional Responsibility in the absence of a waiver from the defendant. *See* DR 5-101(A).

implicate his own credibility and be fraught with ethical issues.[5] *See, e.g.,* Mckeon, 738 F.2d at 34-35 ("If counsel were to cross-examine the witness as to her conversations with him, argue the credibility of her testimony to the jury, or suggest alternative interpretation of her account of the conversations, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue.... [T]he Sixth Amendment interest in counsel of choice must give way when chosen counsel is so compromised.")

        Beyond that, while it is clear that no attorney representing the defendant in this case should be permitted to present evidence or arguments at trial which are at odds with the defendant's allocution in the Bronx, *see United States v. Lauersen*, 2000 WL 1693538 (S.D.N.Y.) (precluding defense counsel from eliciting evidence and/or making arguments directly contradicting specific factual statements made by the defendant during a proffer session because the court was "duty bound to protect the integrity of the proceeding and to ensure that matters presented to the jury are grounded in good faith"), *conviction aff'd on other grounds*, 348 F.3rd 329 (2003),[6] it would be particularly unseemly for one of the attorneys who represented the defendant in the Bronx -- *e.g.*, Mr. Breen -- to even attempt to do so.  "The institutional interest in the rendition of just verdicts in criminal cases," *see Wheat*, 486 U.S. at 160, and that criminal "proceedings appear fair to all who observed them" *id.,* would be jeopardized should Breen remain as the defendant's counsel while at once taking positions inconsistent with the defendant's Bronx guilty pleas.

        Given the defendant's public disavowal of his Bronx guilty plea, *supra,* pp. 4-5, it is more than mere speculation that he may raise defenses at odds with his guilty plea.  Indeed, the defendant's claim that he pled guilty because "[he] just f--ing wanted [the case] to be over" and really didn't do anything wrong suggests that he may very well challenge in this case the

---

        [5] We do not suggest that Breen himself acted unethically or improperly in that investigation, only that the defendant did, and that Breen's representation of the defendant in this matter therefore poses numerous conflicts of interests.

        [6] Accordingly, the Government will -- at the time set by the Court for pre-trial motions -- move to preclude the defendant from offering evidence or making arguments at odds with his Bronx guilty pleas.

factual basis for his the plea in the Bronx -- a plea that was entered and counseled by Mr. Breen.

In these circumstances, and in view of the authority set forth above, we respectfully request that the Court: (1) appoint independent counsel to advise the defendant concerning potential and/or actual conflicts of interest posed by Mr. Breen's representation of him; (2) hold a *Curcio* hearing at which the defendant -- after having been advised by independent counsel -- be carefully questioned by the Court to insure that he is aware of any conflicts that may exist and -- to the extent the law permits him to do so -- waives any such conflicts; and (3) consider disqualifying Breen from representing the defendant.

Respectfully yours,

MICHAEL J. GARCIA
United States Attorney

By: _____
    Asst. U.S. Attorney Perry A. Carbone
    Asst. U.S. Attorney Elliott B. Jacobson

cc:  Kenneth Breen, Esq.  (by fax and mail)

# EXHIBIT 1

1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF BRONX: CRIMINAL TERM: PART A1

3    - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    PEOPLE OF THE STATE OF NEW YORK,          INDICTMENT NO.

5                                             34597C/2006

6            - against -

7    BERNARD KERIK,                            Plea/Sentence

8                        Defendant.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10                           851 Grand Concourse
                             Bronx, NY 10451
11                           June 30, 2006

12   B E F O R E:

13             HONORABLE JOHN P. COLLINS,

14             Justice of the Supreme Court

15   A P P E A R A N C E S:

16

17             ROBERT T. JOHNSON, ESQ.
               District Attorney, Bronx County
               BY: STEPHEN BOOKIN, ESQ.
18             Assistant District Attorney

19

20             JOSEPH TACOPINA, ESQ.
               Attorney for Defendant
21             275 Madison Avenue
               New York, New York    10016
22

23

24                      JOAN MOONEY
                   SENIOR COURT REPORTER
25

1          (Whereupon, the following takes place

2      on the record in open court in the presence

3      of the Court, Assistant District Attorney

4      Bookin, Defense Counsel Tacopina and the

5      defendant, Bernard Kerik, as follows:)

6          THE COURT CLERK:  Number one on the

7  Part A-1 calendar, People versus Bernard Kerik.

8          Appearances please, starting with the

9  assistant district attorney.

10          MR. BOOKIN:  Steven Bookin for the

11  People.

12          MR. TACOPINA:  Your Honor, good

13  morning.

14          For Mr. Kerik Joseph Tacopina, with

15  Paul DeMilia and Ken Green.

16          THE COURT:  Good morning.  Good

17  morning.

18          THE COURT CLERK:  Counsel waive the

19  formal reading of the rights and charges in

20  this case?

21          MR. TACOPINA:  Yes.

22          THE COURT:  Preliminarily,

23  Mr. Bookin, do you wish to be heard?

24          MR. BOOKIN:  Yes, Your Honor.

25          Your Honor, before you begin I wanted

**Proceedings**

1    to request of the Court whether the Court would

2    inquire of the defense whether Mr. Kerik would

3    waive prosecution by information in this

4    matter?

5                    MR. TACOPINA:  Yes, Your Honor, we

6    do.

7                    MR. BOOKIN:  Your Honor, there's a

8    misdemeanor complaint before you today and it

9    is the result of discussions between the Bronx

10    District Attorney's office and the defendant,

11    Bernard Kerik, through his counsel, Joseph

12    Tacopina.

13                    And pursuant to those discussions,

14    the People and the defendant have agreed to a

15    plea agreement, which will serve as a

16    disposition of certain criminal charges

17    currently subject to grand jury investigation.

18                    I would like at this time to tell the

19    Court in a general outline way of what that

20    plea agreement consists of.

21                    In accordance with the plea

22    agreement, defendant, Bernard Kerik, has agreed

23    to plead guilty to two crimes charged in the

24    misdemeanor complaint.

25                    That is a violation of the New York

4

Proceedings

1    City Charter, section 2604 (b) 5, which

2    involves accepting a valuable gift from a

3    person or firm intending to do business with

4    the City of New York.

5            And the second crime being a

6    violation of the New York City Administrative

7    Code Section 12-110 (b) 15, which involves a

8    failure to disclose a loan in the Annual

9    Disclosure Report filed with the New York City

10   Conflicts of Interest Board.

11           Those criminal charges and their

12   facts will be specified in a few minutes I

13   believe as you proceed through these

14   proceedings.

15           Pursuant to the plea agreement,

16   however, the defendant, Bernard Kerik, has

17   agreed to tell this Court what he did in the

18   commission of those crimes, and, in addition,

19   he has agreed to make further statements to

20   this Court regarding these crimes which will be

21   specified in a few minutes.

22           Further, in accordance with the plea

23   agreement defendant, Bernard Kerik, has agreed

24   to be sentenced to a fine of $205,000 on what I

25   will call "the gift count".

5

Proceedings

1          And although not part of the sentence

2    of this Court, the District Attorney will

3    specify on the record at the appropriate time

4    in a few minutes Mr. Kerik's agreement to pay a

5    further civil penalty of $10,000 to the New

6    York City Conflicts of Interest Board regarding

7    that count.

8          Now, on the failure to disclose the

9    loan count, which I call it, the defendant

10   Kerik has agreed to be sentenced to a fine of

11   $1,000.

12         And although not part of the sentence

13   of this Court, the People will specify in a few

14   minutes Mr. Kerik's agreement to pay a further

15   civil penalty of $5,000 to the New York City

16   Conflicts of Interests Board.

17         In addition, as part of this plea

18   agreement, the defendant, Bernard Kerik, has

19   agreed to waive any and all issues regarding

20   the statute of limitations as to these crimes.

21         Further, Mr. Kerik, has agreed to

22   waive any and all issues regarding the

23   geographical jurisdiction of Bronx County as to

24   these crimes.

25         Also, Mr. Kerik has agreed to execute

Proceedings

1    a written waiver of appeal regarding these

2    proceedings.

3              Preliminary that is our statement.

4              THE COURT:  Mr. Tacopina, do you have

5    an application?

6              MR. TACOPINA:  Yes, Your Honor, at

7    this time I am authorized to have my client

8    enter a plea of guilty to the two referenced

9    unclassified misdemeanors, one a violation of

10   the New York City charter, and the other a

11   violation of the administrative code, again

12   unclassified misdemeanors, not out of the State

13   Penal Law, but out of those two statutes.

14             And at this point we are prepared to

15   take that plea.

16             THE COURT:  Mr. Kerik, did you hear

17   what your lawyer said that you wish to enter

18   pleas of guilty to these two crimes?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Is that what you wish to

21   do?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Did you talk to your

24   lawyer before this plea?

25             THE DEFENDANT:  Yes, sir, I did.

Proceedings

1          THE COURT:  Are you making this plea

2     freely and voluntarily?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Do you understand that by

5     making this plea you are waiving, you are

6     giving up certain of your rights, among them

7     your right to a trial by jury and your right to

8     remain silent.

9          THE DEFENDANT:  Yes, I do, Your

10    Honor.

11         THE COURT:  Please listen now to what

12    the District Attorney is going to say with

13    regard to count one.

14         MR. BOOKIN:  Thank you, Your Honor.

15         As to count one, which involves a New

16    York City Charter Section 2604 (b) 5, the facts

17    are that on or about and between August 1998

18    and December 2000, the defendant, Bernard

19    Kerik, as a New York City Commissioner, did

20    accept a valuable gift in the form of

21    renovations to his Bronx apartment, that is 679

22    West 239th Street, apartments 1H and 1J.

23         In an amount valued for the purposes

24    of this plea $165,000 from the Interstate

25    Companies, owned by Frank and Peter DiTommaso,

1  knowing that the Interstate Companies intended

2  to engage in business dealings with the City of

3  New York.

4  Further, the defendant, Bernard

5  Kerik, did speak with officials of the City of

6  New York on two occasions about the Interstate

7  Companies, and on another occasion Mr. Kerik

8  allowed his office as Correction Commissioner

9  of the City of New York to be used for a

10  meeting between the Interstate Companies and

11  the New York City Trade Waste Commission

12  regarding their investigation of the Interstate

13  Companies.

14  Although some may draw inference from

15  these facts, there is no direct evidence of an

16  agreement between Mr. Kerik and the owners of

17  the Interstate Companies, Frank and Peter

18  DiTommaso, that the renovations to Mr. Kerik's

19  apartment were given in return for Mr. Kerik's

20  assistance with the New York City regulators.

21  As stated before, Your Honor,

22  Mr. Kerik has agreed to pay a fine of $165,000

23  as the gain he received, plus an additional

24  fine of $40,000 for a total fine of $205,000.

25  In addition,, although it's not part

9

Proceedings

1   of this sentence, we wish to memorialize the

2   fact that Mr. Kerik has agreed to pay a civil

3   penalty of $10,000 on this count to the New

4   York City Conflicts of Interests Board.

5            THE COURT:  Bernard Kerik, did you

6   hear what the District Attorney said?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  And I understand that you

9   have a further admission to make with regard to

10  that count?

11           MR. TACOPINA:  Your Honor, if I could

12  just before Mr. Kerik says that, I just want to

13  add one thing, because I want to mirror what's

14  in this complaint.

15           It was stated just now the Interstate

16  Companies accepted a gift or valuable from the

17  Interstate Companies, it's the Interstate

18  Companies or a subsidiary, Your Honor.

19           THE COURT:  All right.  That's

20  agreed?

21           MR. BOOKIN:  We have no objection.

22           THE COURT:  That's agreed.  All

23  right.

24           There's a further admission to be

25  made with regard to count one, Mr. Kerik?

Proceedings

1          THE DEFENDANT:  Yes, Your Honor.

2          I admit that I took a gift from

3     Interstate Companies or a subsidiary, and

4     thinking that they were clean, I spoke to City

5     officials about Interstate on two occasions and

6     on another occasion permitted my office to be

7     used for a meeting between Trade Waste

8     authorities and Interstate officials.

9          THE COURT:  Now, with regard to count

10    one, you are pleading guilty based upon the

11    facts as stated by the District Attorney and

12    your additional submitted statement as well?

13         THE DEFENDANT:  Yes, I am.

14         THE COURT:  Now, please listen to the

15    District Attorney with regard to count two.

16         Please state, Mr. District Attorney,

17    the underlying facts supporting the elements of

18    the crime to which the defendant is pleading?

19         MR. BOOKIN:  Thank you, Your Honor.

20         As to count two, which involves the

21    New York City Administrative Code 12-110 (b)

22    15.

23         On or about February 18, 2002, the

24    defendant, Bernard Kerik, being an agency head,

25    having separated from service, failed to

Proceedings

1    disclose on the required annual disclosure

2    report to the New York City Conflict of

3    Interest Board for the calendar year 2001,

4    loans he received from Nathan Berman, which

5    were still outstanding at that time in the

6    amounts of $20,000 in 1999, and $8,000 in 2000.

7            As stated before, Mr. Kerik has

8    agreed to pay a fine of $1,000 for this crime.

9            In addition, Mr. Kerik has agreed

10   apart from the sentence of this Court, which I

11   am now memorializing, to pay a civil penalty of

12   $5,000 to the New York City Conflict of

13   Interest Board.

14           THE COURT:  Bernard Kerik, did you

15   hear what the assistant district attorney said?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  And now I understand you

18   have an additional admission with regard to

19   count two?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  I will hear you.

22           THE DEFENDANT:  I did not report a

23   loan from Mr. Nathan Berman in 2001.

24           THE COURT:  Now, with regard to count

25   two are you pleading guilty based upon the

12

Proceedings

1    facts as stated by the District Attorney and

2    the additional statement made by you?

3              THE DEFENDANT:  Yes, sir, I am.

4              THE COURT:  Now, I understand that a

5    written waiver of appeal required by the

6    District Attorney has been signed by you,

7    Mr. Kerik; is that correct?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  And has your lawyer

10   explained this to you?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  And do you know the

13   significance that you cannot further challenge

14   in any Appellate Court the plea or the sentence

15   to be imposed here today?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  And do you further

18   understand that you are waiving any claim to

19   the statute of limitations and any objection to

20   the geographic jurisdiction of Bronx County?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Mr. District Attorney, is

23   the plea acceptable to the People?

24             MR. BOOKIN:  Yes, Your Honor, it is.

25             THE COURT:  All right.

Proceedings

1          Bernard Kerik, you are charged in

2      count one with what the State refers to as an

3      unclassified misdemeanor, the crime and

4      violation of section 2604 (b) 5 of the New York

5      City charter.

6          How do you plead to that charge,

7      guilty or not guilty?

8          THE DEFENDANT:  Guilty.

9          THE COURT:  And you are further

10     charged in count two in what the state refers

11     to as an unclassified misdemeanor, a crime in

12     violation of title or section 12-110 (b) 15 of

13     the New York City Administrative Code.

14         How do you plead to that charge,

15     guilty or not guilty?

16         THE DEFENDANT:  Guilty.

17         THE COURT:  All right.  The pleas

18     have been entered.

19         Counsel, is the defendant prepared to

20     be sentenced today?

21         MR. TACOPINA:  We are, Your Honor.

22         THE COURT:  Is that agreeable to the

23     District Attorney?

24         MR. BOOKIN:  Yes, Your Honor.

25         THE COURT:  The defendant is before

Proceedings

1   the Court for sentence having entered pleas of

2   guilty to two crimes, unclassified misdemeanors

3   in count one in violation of section 2604 (b) 5

4   of the New York City Charter;

5           And in count two in violation of

6   title 12-110 (b) 15, of the New York City

7   Administrative Code.

8           Does the District Attorney wish to be

9   heard?

10          MR. BOOKIN:  Yes, Your Honor.

11          Your Honor, at this time in terms of

12  sentence, the People believe that since this is

13  the defendant's first offense and he is paying

14  a substantial fine on these two particular

15  counts and with regard to all of the other

16  matters regarding his background, we believe

17  that this is a just outcome.

18          THE COURT:  Mr. Tacopina, do you wish

19  to be heard?

20          MR. TACOPINA:  No, Your Honor.  We

21  are going to rely upon the agreement and we are

22  prepared to go forward.

23          THE COURT:  Bernard Kerik, is there

24  anything you wish to say before the Court

25  imposes sentence?

Proceedings

1          THE DEFENDANT:  No, sir.

2          THE COURT:  All right.  This is a

3     negotiated plea that this Court is aware that

4     the District Attorney and the New York City

5     Department of Investigation carried out a

6     thorough and exacting investigation.

7          The charges have been filed in this

8     Court as part of a plea arrangement.  A

9     decorated Police Officer and former high City

10    official has been brought before this Court.

11         By statements made by these

12    proceedings in court today that no man or woman

13    is above the law.

14         This Court recognizes the

15    contribution made to the City by Bernard Kerik

16    as a Police Officer, Correction Commissioner,

17    and New York City Police Commissioner,

18    particularly during his service on September

19    the 11th, 2001, and in the days thereafter.

20         Still, the defendant has violated the

21    law for personal gain.

22         Weighing the various factors, this

23    Court regards the disposition of these matters

24    today to be fair, equitable and proper.

25         It's the judgment of the Court with

16

Proceedings

1    regard to count one of a fine in the amount of

2    $205,000 or 90 days be imposed.

3                   It is the further judgment of this

4    Court on count two that a fine in the amount of

5    $1,000 or 15 days be imposed.

6                   The Court imposes the mandatory

7    surcharge and the victim assistance fee.

8                   The defendant has until September the

9    5th to pay the fines, the surcharge and the

10   fees.

11                  Are there any other matters

12   concerning this item?

13                  MR. BOOKIN:  No, Your Honor.

14                  MR. TACOPINA:  No, Your Honor.  Thank

15   you very much.

16                  THE COURT:  Proceedings are

17   concluded.

18                  (No further proceedings.)

19               *      *      *      *      *

20                  I hereby certify that the foregoing

21   transcript is a true and accurate transcription

22   of the original stenographic proceedings held

23   in the above matter.

24   _____

                    Joan Mooney

25                  Senior Court Reporter