UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

BERNARD B. KERIK,

Defendant.

S1 07 Cr. 1027 (SCR)

OPINION AND ORDER

---

**STEPHEN C. ROBINSON, United States District Judge:**

The defendant, Bernard Kerik, is charged with various federal crimes in a fifteen-count, omnibus Superseding Indictment.  On September 22, 2008, Kerik filed a pretrial motion seeking to dismiss certain charges, to sever counts in the indictment, and to obtain additional discovery from the Government.[1]  After the parties filed nearly 250 pages of briefing, the motion was fully submitted on January 23, 2009 and oral argument was heard on February 3, 2009.  For the reasons set forth in this Opinion and Order, Kerik's various motions are granted in part and denied in part.

## I.    Background

Because Kerik moves to dismiss several charges by challenging the legal sufficiency of the Superseding Indictment, the Court begins by summarizing the allegations against the defendant.[2]  For the purposes of resolving Kerik's pending motion to dismiss, the pertinent allegations in the Superseding Indictment are assumed to be true.  *Boyce Motor Lines v. United*

---

[1]  The original Indictment was returned on November 8, 2007.  During briefing on the present motion, a grand jury returned a Superseding Indictment on December 2, 2008.  The Superseding Indictment rendered moot Kerik's multiplicity objection to the original Indictment.

[2]  This account supplements the Court's summary of allegations against Kerik in a related opinion, *United States v. Kerik*, 531 F. Supp. 2d 610 (S.D.N.Y. 2008).

*States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).

During the time period covered by the Superseding Indictment, Kerik held and sought various positions of public trust.  From January 5, 1998 to August 20, 2000, Kerik served as the Commissioner of the New York City Department of Corrections ("DOC"), thereafter serving as the New York City Police Commissioner until January 1, 2002.  Sup. Indict. ¶¶ 1-2.  In 2003, he accepted the post of Senior Policy Advisor to the Interior Minister of the Coalition Provisional Authority of Iraq.  In December 2004, the President of the United States nominated Kerik to serve as Secretary of the Department of Homeland Security, a position for which Kerik later withdrew from consideration.  Sup. Indict. ¶ 50.  Based on facts uncovered during that nomination process, the Bronx County District Attorney and the New York Department of Investigation opened an investigation into Kerik's activities.  This investigation concluded in June 2006 upon Kerik's guilty plea to two unclassified misdemeanors in state court.

The federal government subsequently brought the following charges.  In Count One, Kerik is charged with conspiracy to violate the mail and wire fraud statutes from 1998 to 2006, in violation of 18 U.S.C. § 1349.  The Superseding Indictment alleges that Kerik conspired with at least two other unnamed individuals (principals of an anonymous XYZ Company) to defraud and deprive the City of New York and its citizens of their intangible right to Kerik's honest services as a government official.  Sup. Indict. ¶ 5.  Specifically, the conspirators agreed that Kerik would use his public office as Commissioner of Corrections, and subsequently as Police Commissioner, to "vouch" for XYZ in order to influence regulators and other public officials who were considering whether XYZ should be licensed to do business in New York City.  Sup. Indict. ¶¶ 14-16.  At that time, XYZ was seeking municipal-regulated business, including a

permit from the New York City Department of Sanitation to operate a material fill transfer station on Staten Island.  Sup. Indict. ¶ 6.  The Superseding Indictment alleges that a part and object of the conspiracy was that XYZ would "obtain licenses, permits, clearances, and approvals to do business with one or more New York City agencies or within an industry regulated by the City," including the material fill transfer station permit.  Sup. Indict. ¶ 7.  In return, Kerik received approximately $255,000 in renovations to his apartment in Riverdale, New York, from John Doe #1, John Doe #2, and XYZ.  Sup. Indict. ¶¶ 12-13, 29(a).  Finally, the Government alleges that "it was a necessary part of the agreement to conceal the illegal payments [to Kerik] from New York City officials and regulators" while XYZ was seeking authorization from the City to obtain licenses and permits.  Sup. Indict. ¶ 20.

Counts Two and Three charge Kerik with the substantive counts of mail and wire fraud, respectively, for the theft of Kerik's honest services as described in Count One, in violation of 18 U.S.C. §§ 2, 1341, 1343, and 1346.  Sup. Indict. ¶¶ 21-24.

Count Four charges Kerik with corruptly obstructing and impeding the due administration of the federal tax laws.  Sup. Indict. ¶ 27; 26 U.S.C. § 7212(a).  First, Kerik failed to report as taxable income for 1999 and 2000 the renovation value to his Riverdale apartment worth $255,000.  Sup. Indict. ¶ 29(a).  Second, Kerik failed to report the apartment rental value of payments made on Kerik's behalf by a Manhattan realtor valued at $236,269.36 from 2001 through 2003.  Sup. Indict. ¶ 29(b).  Third, Kerik failed to report his consulting income of $20,000 from a computer software company in 2002.  Sup. Indict. ¶ 29(c).  Fourth, Kerik failed to report publishing royalties he received from 2002 through 2004 totaling $75,953.  Sup. Indict. ¶ 29(d).  Fifth, Kerik failed to report as taxable income in 2005 the use of a new luxury sedan provided by a car company as compensation for Kerik's services.  Sup. Indict. ¶ 29(e).  Sixth, in

early 2003 Kerik falsely advised his accountant that he had made $80,000 in charitable contributions.  Based on this information, Kerik signed a false U.S. Individual Income Tax Return that listed phony tax deductions of $80,000.  Sup. Indict. ¶ 30(a).  Seventh, Kerik claimed a false business expense deduction in 2003 for the use of a home office that he claimed to have maintained in the state of New Jersey.  Sup. Indict. ¶ 30(b).  Eighth, Kerik failed to report to the Internal Revenue Service in 2002 and 2003 that he employed a regular domestic employee as a nanny.  Kerik also failed to remit any payroll taxes due and owing for his nanny, including Social Security and Medicare taxes.  Sup. Indict. ¶ 31.  Finally, the Government charges that Kerik structured his financial transactions in such a way to avoid alerting the IRS of his tax evasion.  Sup. Indict. ¶ 28.

Counts Five through Seven charge Kerik with aiding and assisting in the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2), and Counts Eight and Nine charge Kerik with subscribing to false income tax returns, in violation of 26 U.S.C. § 7206(1). These charges are premised on the same underlying tax allegations set forth above.  Sup. Indict. ¶¶ 33, 35 (accompanying charts).

In Count Ten, Kerik is charged with misrepresenting a personal loan in September 1999 on an application for a mortgage from National Community Bank, a financial institution insured by the Federal Deposit Insurance Corporation.  Specifically, Kerik accepted a personal loan of $28,000 from "John Doe #6," a Manhattan realtor who conducted business that required various approvals from New York City.  Kerik falsely reported to National Community Bank that the funds were a wedding gift and failed to classify the loan as a liability on his mortgage application.  Sup. Indict. ¶¶ 36-40.

Finally, Counts Eleven through Fifteen charge Kerik with making false statements to the federal government, in violation of 18 U.S.C. § 1001.  As will be explained in greater detail in the Court's analysis below, Kerik is alleged to have misrepresented the following facts:  (1) that Kerik did not employ any household employees on a regular basis; (2) that Kerik possessed no questionable business relationships or information that might cause embarrassment to himself or the President; (3) that Kerik did not have any liabilities in excess of $10,000 in November 2003; and (4) that Kerik, while serving as a public official, did not have any financial dealings with individuals seeking to do business with New York City.  Finally, the Government charges that Kerik gave a false and misleading account of the true nature of his relationship with John Doe #3—an employee of XYZ—and the renovations to Kerik's Riverdale apartment.

## II.    Analysis

In the gravamina of this motion, Kerik challenges the sufficiency of particular charges in the Superseding Indictment.  A defendant seeking to dismiss counts under Rule 12 must satisfy a "high standard."  *United States v. Lazore*, 90 F. Supp. 2d 202, 203 (N.D.N.Y. 2000).  As the Supreme Court of the United States has explained:

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.  It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.  Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.

*Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (internal quotation marks and citations omitted); *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).  With this direction, each of Kerik's arguments is considered in turn below.

### a.   Validity of the Honest Services Fraud Charge

In short, sections 1341 and 1343 of Title 18 criminalize the use of the federal mails and wires, respectively, for the purpose of executing "any scheme or artifice to defraud."  As 18 U.S.C. § 1346 helpfully clarifies, "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  Equipped only with these 28 cryptic words, it is the duty of the courts to cast form out of the nebulous crime of honest services fraud.[3]

Kerik argues that the conduct charged in the Superseding Indictment does not constitute a federal crime, and he moves to dismiss Counts One, Two, and Three for failure to state a claim for honest services fraud.  In framing the issue for the Court, Kerik argues for "a sharp distinction between the use, or even misuse, of the *influence* of office in activities falling *outside* a defendant's official duties—which cannot support a prosecution for federal honest services fraud—and corruption in connection with the performance of a defendant's official duties— which can."  Mem., pp. 21, 25 (collecting cases).[4]  In sum, Kerik argues that no cases affirm a conviction for "influence peddling"[5] where the public official was acting outside the context of

---

3   This Court is not the first to struggle with the scope of honest services fraud, and it will surely not be the last.  As one circuit court has noted, "The central problem is that the concept of 'honest services' is vague and undefined by the statute.  So, as one moves beyond core misconduct covered by the statute (*e.g.,* taking a bribe for a legislative vote), difficult questions arise in giving coherent content to the phrase through judicial glosses."  *United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008).

4   Memorandum of Law in Support of Bernard B. Kerik's Pretrial Motions ("Mem."), dated Sept. 22, 2008.

5   This term, used in the Superseding Indictment, aptly characterizes the honest services fraud allegation against Kerik in this case.  Sup. Indict. ¶ 3(j).

his official duties.[6]  Mem., p. 31 (distinguishing cases).  Because Kerik is alleged to have used

his status as Commissioner of the DOC and Police Commissioner to "vouch" for XYZ in

connection with business integrity investigations of that company being conducted by three

independent agencies—not by any agency under Kerik's control—he urges the Court to dismiss

the charges for honest services fraud.

Kerik offers *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), as his leading case.

In *Urciuoli*, the Court of Appeals for the First Circuit reversed the convictions of two hospital

executives accused of conspiracy to deprive Rhode Island citizens of the honest services of a

state legislator.  The legislator was charged with failing to disclose his financial interest in the

hospital on two specific occasions:  (1) when lobbying mayors to "comply with Rhode Island

law governing patient entitlement to be taken by ambulance to the hospital of the patient's

choice," and (2) when negotiating a settlement between an insurance company and the hospital.

513 F.3d at 294.  In this second instance, the legislator was alleged to have threatened to use his

official authority to punish the insurance company unless it reached a settlement favorable to the

hospital.  *Id.* at 296-97.

The district court instructed the jury that an elected official owes a duty to provide honest

services when he acts "under the cloak of office"—a phrase intended to capture a sphere of

behavior broader than the official's formal duties.  *Id.* at 295.  The First Circuit held that this

instruction was erroneous because it could include private conduct that does not implicate "any

purported oversight authority or threatened . . . use [of] official powers in support of his

advocacy."  *Id.* at 296.  Pertinently, the court determined that the legislator's "title and (possibly

improper) use of his senate letterhead assured him access and attention; but his position

---

[6]  In the Superseding Indictment, the Government removed its former allegation that it was one of Kerik's official
duties to confer with other government officials.  Therefore, the parties agree that Kerik is not alleged to have
violated his *official* duties in vouching for XYZ.

guaranteed that in any event and its invisible force would have existed even if he emphasized that he was present solely as a paid advocate." *Id*. The court ultimately reversed the defendants' conviction for lobbying the mayors, but permitted an honest services fraud prosecution for the legislator's threatened use of his power in the insurance settlement conference.

While *Urciuoli* may be fairly read to support Kerik's position,[7] other courts—including the Court of Appeals for the Second Circuit—have held that a defendant may be charged with honest services fraud for using his or her influence with governmental decision-makers for personal gain, even if the alleged scheme does not implicate one of the defendant's official duties. On this point, *United States v. Middlemiss*, 217 F.3d 112 (2d Cir. 2000), and *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), are instructive. In *Middlemiss*, a public affairs officer at the Port Authority of New York and New Jersey agreed to help a businessman obtain a lease from the Port Authority to operate a diner at JFK International Airport. 217 F.3d at 115. Middlemiss did so in exchange for a 12.5% interest in the diner. *Id*. Middlemiss recommended to other officials that the lease be approved, while failing to disclose his financial interest in the diner. Middlemiss argued on appeal that his conviction was improper under 18 U.S.C. § 1346 because "he did not render dishonest or corrupt services because his official job duties had nothing to do with airport leasing." *Id*. at 119-20. Yet the Second Circuit held that as long as a public employee has engaged in a scheme to deprive the employer of his honest services, "there is no requirement that the scheme also implicate the [employee's] official duties." *Id*. at 120.

---

7   The Court notes that *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), also supports Kerik's position. 583 F.2d at 1026 ("We also find no evidence that Rabbitt's conduct deprived the citizens of their right to honesty and fairness in the conduct of his official duties. Rabbitt did not, in his official capacity, control the awarding of contracts to architects."). *Rabbitt* has been questioned by other circuits, *see Urciuoli*, 513 F.3d at 296 (setting aside the issue "whether *Rabbitt* is correct"); *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987) ("We very much doubt the soundness of this reasoning. The fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight independent of their intrinsic merit."), and this Court is not persuaded by its reasoning.

Similarly, in *Bush*, the press secretary to the Mayor of Chicago failed to disclose his financial interest in an advertising company while he was advocating on the company's behalf for a contract at O'Hare International Airport.[8]  The court reasoned that although Bush was not responsible for awarding the O'Hare advertising contract, he used his "official position within the mayor's inner circle to exert the substantial influence which he had on those who were responsible for negotiating the contract."  522 F.2d at 647.  Importantly, the court concluded, "Bush was not making his recommendation merely as a disinterested public servant.  His ownership of [the advertising company] was material to the city officials' evaluation of Bush's opinion of the company which he was recommending."  *Id*.  Bush's failure to render honest services, combined with his material misrepresentations and active concealment, violated federal law.  *Id*. at 648.

Considering the applicable case law, the Court concludes that "[m]isuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime."  *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998).[9]  It is apparent, at this stage in the case, that Kerik "used" his office—literally and figuratively—to vouch for John Doe #1, John Doe #2, John Doe #3, and XYZ.[10]  Kerik did

---

[8]  *United States v. Bush* was decided before the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987).  In *McNally*, the Supreme Court held that a scheme under the mail and wire fraud statutes must implicate a property right; consequently, honest services fraud (an intangible right) was not actionable.  Congress responded the following year by enacting 18 U.S.C. § 1346, which abrogated *McNally* and reinstated the honest services fraud crime.  Thereafter, courts have relied on pre-*McNally* precedent to interpret the scope of 18 U.S.C. § 1346.  *See, e.g.*, *United States v. Rybicki*, 354 F.3d 124, 138-39 (2d Cir. 2003) (en banc).

[9]  Kerik's reliance on *Bloom* is misplaced.  The charges against Bloom arose from his conduct as a lawyer in the private-sector.  The Seventh Circuit held that Bloom could not be charged with honest services fraud for his private conduct—giving a client legal advice that could harm the city's financial interests—simply because Bloom also held a concurrent, part-time position as an Alderman for Chicago's Fifth Ward.  As the Seventh Circuit emphasized, the indictment "d[id] not charge that [the defendant] *used* his office in any way, let alone that he *mis*used it."  149 F.3d at 655.

[10]  Sup. Indict. ¶ 18 ("In or about August or September of 1999, Kerik facilitated a meeting between John Doe #3 and [New York City Trade Waste Commission] Investigators in his [DOC] office and allowed his official offices to be used by them to discuss the ongoing investigation of XYZ."); Tr. at 88 ("Mr. Kerik used his inside contacts to

-9-

not vouch for his co-conspirators simply as a private citizen; taking the allegations in the light most favorable to the Government, the Superseding Indictment fairly charges that *but for* Kerik's official status, he would not have been able to play his designated role in the conspiracy.  Sup. Indict. ¶ 10 ("In or about late 1998, XYZ enlisted the influence and assistance of Kerik in its efforts to convince regulators that the company had rid itself of organized crime ties and otherwise possessed the requisite integrity to perform publicly funded or regulated contracts.").  It was precisely his official access and power that afforded Kerik the ability to influence other officials.

While the Court desires to cabin the breadth of section 1346 due to potential abuse of honest services fraud prosecutions, Kerik's position is inconsistent with binding case law in this circuit—namely, *Middlemiss*—and would create an imprudent precedent for public officeholders.  Moreover, it is unlikely that Congress intended to permit an official to receive surreptitious payments and, in exchange, use his official status—with all its access and influence—to steer the direction of government business so long as that official did not abuse one of his official, enumerated duties.  Although teetering on the boundaries of 18 U.S.C. § 1346, the Court concludes that the Superseding Indictment charges a colorable allegation of honest services fraud.

Finally, Kerik argues—presumably to preserve the issue for appeal—that 18 U.S.C. § 1346 is unconstitutionally vague.  Mem., p. 33.  Of course, in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), an en banc panel of this Circuit squarely rejected the argument that section 1346 is unconstitutionally vague on its face.  In the alternative, Kerik urges the Court to

---

facilitate a meeting in his physical office as [C]orrections [C]ommissioner with representatives of the New York City Trade Waste Commission and John Doe #3. Mr. Kerik attended a meeting with an official from the New York City Department of Investigation and the Trade Waste Commission.  He then called the assistant commissioner of the Department of Investigation to attempt to vouch for XYZ.").

consider the rule of lenity, due process, and fair warning when construing the honest services fraud statute, *i.e.*, that Kerik did not have fair notice that a public official could be prosecuted under the mail and wire fraud statutes for conduct unrelated to his performance of his official duties.  While at least one member of the Supreme Court may be sympathetic to this argument,[11] *Rybicki* and *Middlemiss* foreclose the issue for this Court.

### b.  Statute of Limitations

Alternatively, Kerik moves to dismiss Counts One, Two, and Three as barred by the applicable statute of limitations.  Because the Government alleges that separate acts place each Count within the limitations period, the Court considers each charge separately.

### i.  Count One—Conspiracy

Federal conspiracy claims are subject to a five-year statute of limitations that runs after the last overt act in furtherance of the conspiracy was committed.  Due to three separate tolling agreements between Kerik and the Government, the applicable, effective date of the indictment for limitations purposes is April 14, 2007.[12]  Thus, the Government must proffer evidence of an ongoing conspiracy as of April 14, 2002 to satisfy the limitations bar.

To determine whether any acts in furtherance of a conspiracy were committed in the limitations period, the Court must, as a threshold matter, construe the scope of the alleged conspiracy.  *Grunewald v. United States*, 353 U.S. 391, 397 (1957) ("[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial

---

[11] Dissenting from a denial of certiorari, Justice Scalia recently commented on the "current chaos" surrounding the honest services fraud statute, 18 U.S.C. § 1346.  *Sorich v. United States*, 129 S.Ct. 1308, 1311 (2009) (Scalia, J., dissenting).  Justice Scalia criticized lower courts for failing to identify some coherent limiting principle to define "the intangible right to honest services."  129 S.Ct. at 1309-10.  Failure to specify the "principle . . . that separates the criminal breaches, conflicts and misstatements from the obnoxious but lawful ones," Justice Scalia observed, "invites abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct."  *Id.* at 1310.

[12] *See* Gov't Exhs. B, C, and D to Government's Memorandum of Law in Opposition to Defendant's Pre-Trial Omnibus Motions ("Opp."), dated Dec. 5, 2008.

agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."); *accord United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir. 2003).  Kerik argues that the conspiracy is limited to the misuse of his office as Commissioner of the Department of Corrections and the NYPD.  Because Kerik resigned his post as Police Commissioner on January 1, 2002, he argues that there can be no overt acts within the five-year limitations period.

Kerik's formulation construes the scope of the conspiracy too narrowly and ignores other allegations in the Superseding Indictment.  The Superseding Indictment alleges at least three distinct objects or means of the conspiracy.  First, the conspirators agreed to execute a "scheme and artifice to defraud, and to deprive the City of New York and its citizens of their intangible right to honest services of Kerik."  Sup. Indict. ¶ 5.  Second, it was "a part and object of the conspiracy that XYZ, John Doe #1, John Doe #2, and others known and unknown would and did give money and other things of value to Kerik, and that Kerik, while concealing material information . . . agreed to assist and endeavored to assist XYZ though the use of his public office, by, among other things, contacting on XYZ's behalf regulators and other public officials who were considering whether XYZ should be licensed to do business in New York City and should be awarded municipal-related business . . . ."  Sup. Indict. ¶ 6.  Third, "[i]t was further a part and object of the conspiracy that XYZ would obtain licenses, permits, clearances, and approvals to do business with one or more New York City agencies or within an industry regulated by the City . . . ."  Sup. Indict. ¶ 7.  In summary, the object of the conspiracy was that Kerik would use his public office to vouch for John Doe #1, John Doe #2, and XYZ in order to help them get the requisite licenses and permits from the City of New York.  In return, Kerik received over $250,000 in renovations to his Riverdale apartment.

Therefore, a key object of the conspiracy was for XYZ to gain the licenses and permits to do business with the City of New York.  Indeed, it seems apparent from the allegations in the Superseding Indictment that this was the full economic motivation for Kerik's co-conspirators. It follows, then, that the conspiracy continued in operation—absent some act of affirmative withdrawal—until that object was either achieved or obviated.  *Salmonese*, 352 F.3d at 615 (recounting the "well-established principles that (1) a conspiracy continues until its aim has been achieved, it has been abandoned, or otherwise terminated, and (2) absent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators") (internal quotation marks and citations omitted).

In a bill of particulars provided to the defendant on November 30, 2007, the Government disclosed its intent to introduce a letter to the Department of Sanitation from an attorney of XYZ, dated October 28, 2002.  *See* Gov't Exh. E, pp. 6-7 (bill of particulars).  The communication sets forth background information on XYZ on an application for a fill material operation permit.  *See* Gov't Exh. F.  On the application, XYZ checked "no" in response to the question whether it had "given, or offered to give, money or any other benefit to a public servant with the intent to influence that public servant with respect to any of his or her official acts, duties or decisions" within the last 10 years.  *Id*., p. 9 (question 23(b)).  This mailing was unquestionably sent during the limitations period and was plausibly issued in furtherance of the conspiracy to corruptly obtain New York City permits.  *United States v. Rucker*, 586 F.2d 899, 906 (2d Cir. 1978) ("Every act in furtherance of the conspiracy is regarded in law as a renewal or continuance of the unlawful agreement, and the conspiracy continues so long as overt acts in furtherance of its purposes are done.").  It is axiomatic that the acts of a conspirator are attributable to his co-

conspirators and may be considered for purposes of determining the statute of limitations. *Salmonese*, 352 F.3d at 617.

Because the Court finds that the Government can offer at least one overt act in furtherance of the conspiracy's scope within the applicable statute of limitations, the Court need not consider the parties' remaining arguments.[13]  Kerik's motion to dismiss Count One as untimely is denied.

### ii.  Count Two—Mail Fraud

The same five-year limitations period applies to the substantive counts of mail and wire fraud.  18 U.S.C. § 3282.  Kerik urges the Court to dismiss Counts Two and Three as untimely because Kerik cannot have continued a scheme to deprive the citizens of New York of his honest services after he left office.  Subject to a minor caveat explained *infra*, the Court agrees.  For the reasons set forth below, Count Three is dismissed as untimely and Count Two may remain as charged.[14]

_____

[13] Specifically, the Court declines to decide the Government's alternative argument, based on *United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982), that the conspiracy continues until the conspirators "receive their anticipated economic benefits."  679 F.2d at 1035.  Also, given that the Court does not regard the effect of any so-called "concealment conspiracy" in deciding the timeliness of Count One, it is unnecessary to resolve Kerik's argument relying on *Grunewald v. United States*, 353 U.S. 391 (1957).  Finally, the Court, at this time, need not resolve the Government's argument that 18 U.S.C. §1349 does not require an overt act and that the conspiracy is therefore presumed to continue in perpetuity.  *See* Opp., p. 19; *Salmonese*, 352 F.3d at 620 ("In such cases [where no overt act is required], once the government proves the conspiracy's existence, the scheme's continued operation into the limitations period is presumed without the jury having to find proved the timely commission of any overt act, alleged or unalleged.") (citations omitted).  As an alternative means to defeat a statute of limitations defense, the Government expects to prove at trial that the Business Integrity Commission issued its completed recommendation to the New York City Department of Sanitation (DOS), urging the DOS to deny XYZ's application for a permit to operate the material fill station because of XYZ's ties to organized crime.  Opp., p. 18.  This recommendation, purportedly issued on March 7, 2005, sits comfortably within the limitations period, and the Government argues that the conspiracy is presumed to continue at least until this juncture.  As resolution of this issue is unnecessary for this Court's present decision, it may be raised again at a later occasion.

[14] Consideration of this matter is not premature, notwithstanding the Government's argument to the contrary.  *See* Opp., pp. 26-28.  In fact, a statute of limitations defense must be raised before a trial, else it is waived.  *United States v. Walsh*, 700 F.2d 846, 856 (2d Cir. 1983); 24 *Moore's Federal Practice*, § 612.05[3] (Mathew Bender 3d ed. 2008).  *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998), does not hold otherwise.  In *Alfonso* the Second Circuit held that the "determination of whether the jurisdictional element has been satisfied" is premature on a Rule 12 motion when it "is part and parcel of the inquiry into the 'general issue' of whether the statute has been violated."  143 F.3d at 777.  The Government argues that details of the particular wire or mailing are

The mail fraud statute criminalizes the use of the federal mails to perpetrate "any scheme or artifice to defraud," including a "scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. §§ 1341, 1346.  By definition, the criminal "scheme" for which Kerik is charged must relate directly to the deprivation of honest services.  The Superseding Indictment refers to the scheme as "influence peddling," and, as the Superseding Indictment explicitly alleges, the honest services *scheme* is only a subset of the "scope" of the honest services *conspiracy*.  In other words, the honest services fraud was only one part of the broader conspiracy to unlawfully obtain licenses and permits for XYZ.

Given that the honest services scheme necessarily terminated when Kerik left office— after all, one stripped of his influence has nothing left to peddle—the question becomes whether any subsequent acts can be classified "in furtherance" of that scheme.  *See Schmuck v. United States*, 489 U.S. 705, 715 (1989) ("The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time . . . .").  Under limited circumstances, a subsequent act designed to "lull" a victim into believing that no scheme occurred is sufficient to constitute a substantive act in furtherance of the scheme.  *See United States v. Victor Teicher & Co.*, 726 F. Supp. 1424, 1435 (S.D.N.Y. 1989) ("[C]ommunications subsequent to the end of a scheme to defraud can support a wire fraud charge where they 'were

---

"jurisdictional elements" that also constitute "substantive elements" of the offense charged.  *See Rybicki*, 287 F.3d at 260 (use of the mails and wires is a jurisdictional element).  In this case, however, the Government has already proffered the exact wire and mailing that it contends will satisfy the five-year statute of limitations in 18 U.S.C. § 3282, a proffer explicitly absent in *Alfonso*.  143 F.3d at 777 n.7 ("[T]he formal consent of both parties would not be required for the district court to undertake a pretrial determination of the sufficiency of the jurisdictional evidence where the government has made a sufficient proffer to permit such a ruling . . . .").  Moreover, the simple determination of whether the particular wire or mailing falls within the applicable limitations period does not, in any fashion, resolve the "general issue" of whether the mail and wire fraud statutes have been violated.  *See* FED. R. CRIM. P. 12(b) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.").  The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged."  *United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995); *Alfonso*, 143 F.3d at 777 (same).  Pre-trial resolution of Kerik's limitations argument simply protects the defendant from having to defend against stale charges.

designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'") (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)); *see also United States v. Lane*, 474 U.S. 438, 451-53 (1986).

The Government argues that Count Two is timely because the letter to the Department of Sanitation from an attorney of XYZ, dated October 28, 2002, was designed to lull the DOS from discovering the honest services fraud scheme.  As described above, XYZ checked "no" in response to the question whether it had "given, or offered to give, money or any other benefit to a public servant with the intent to influence that public servant with respect to any of his or her official acts, duties or decisions" within the last 10 years.  Opp., Exh. F, p. 9 (question 23(b)).  It does not strain credulity—and a reasonable juror could find—that the letter constitutes a part of the scheme to deprive New York citizens of Kerik's honest services and was a conscious attempt to prevent the DOS from uncovering the alleged scheme.  Resolution of this factual issue must be left to the jury.[15]

Of course, this letter was not sent by the defendant.  But Kerik is also alleged to have violated 18 U.S.C. § 2 under the mail fraud charge in the Superseding Indictment.  That statute states, in relevant part, that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  18 U.S.C. § 2(b).  Count Two alleges that Kerik, "for the purpose of executing [the honest services fraud] scheme . . . *caused* matters and things to be delivered by mail according to the directions thereon, to wit, correspondence, invoices, *prequalification and background forms*, and bidding documents."  Sup. Indict. ¶ 22 (emphasis supplied).  Because the Court assumes that

---

[15] Similarly, the factual question of whether the questionnaire contains any misrepresentations—Kerik arguably did not violate any of his "*official* acts, duties or decisions," *see* Def. Reply Mem., p. 9 n.3; *see also* note 6, *supra*—is also better suited for the jury.

all allegations made in the Superseding Indictment are true, the Government has properly alleged that the mailing is attributable to Kerik under 18 U.S.C. § 2.  Kerik's motion to dismiss Count Two as untimely is therefore denied.

### iii.   Count Three—Wire Fraud

In support of the timeliness of Count Three, the Government offers a facsimile transmission, dated December 30, 2004, from Kerik to the contractor responsible for the renovations to his Riverdale apartment.  *See* Opp., Gov't Exh. G.[16]  The Government similarly contends that this fax—unquestionably sent within the limitations period—constitutes a "lulling letter" in furtherance of the honest services fraud scheme.  Opp., p. 30.

The Government's attempt to classify the December 2004 fax as a "lulling letter" is unpersuasive.  As noted above, so-called "lulling letters" are designed to lull a victim into a false sense of security and to convince him that no crime is afoot.  *Lane*, 474 U.S. at 452.  That simply is not the case here.  First, the fax was not sent to a victim; rather it was directed at a "critical witness" and, in the Government's own characterization, it was designed to plant a false statement with that witness.  Second, and more important, at the time this fax was sent, Kerik was under investigation by the Bronx District Attorney and the New York Department of Investigation.  Once that investigation began, it is implausible to argue that Kerik was "lulling" his victims to avoid the discovery of the alleged crime.

In *United States v. Victor Teicher & Co.*, the defendant was charged with wire fraud for placing a phone call during which he asked another employee to "destroy a page from [his] desk calendar."  726 F. Supp. at 1435.  The court rejected the government's argument that the call

---

[16] The Government maintained in its briefs and at oral argument that it has not made a full proffer of the evidence it intends to submit at trial.  Opp., pp. 27-28.  However, the Government was on notice that the defendant moved to dismiss Counts One, Two, and Three on statute of limitations grounds.  The Government had ample opportunity to proffer any evidence it desired to defeat Kerik's defense.  The Court has considered all evidence offered by the Government and must decide the pending motion on the record developed by the parties.

constituted a "lull" and dismissed the wire fraud charge because the phone call was placed after

the scheme "had already ended and been discovered by the [investigators]." *Id.* Therefore, the

court held, the call could not have been "for the purpose of executing the scheme to defraud . . .

but rather [it] was an effort to cover up [the defendant's] participation in that very scheme . . . ."

*Id.* Like the defendant in *Victor Teicher*, Kerik may have been attempting to cover-up his

wrongdoing and obstruct justice, but those acts constitute separate crimes with which Kerik has

not been charged in this indictment.[17]

### c. False Statement Claims

Generally, 18 U.S.C. § 1001 criminalizes false statements made in any matter within

federal jurisdiction.[18] "It is well established that this section encompasses within its proscription

two distinct offenses, concealment of a material fact and false representation." *United States v.*

*Diogo*, 320 F.2d 898, 902 (2d Cir. 1963). Where a question is so vague as to be fundamentally

---

[17] *United States v. Elkin*, 731 F.2d 1005 (2d Cir. 1984), *overruled on other grounds*, *United States v. Knoll*, 116 F.3d 994 (2d Cir. 1997), is not contrary. In *Elkin*, the defendant was accused of defrauding the Department of Defense by claiming payment for work purportedly performed on the DOD's behalf. After the defendant's company defaulted on the contract, the DOD never received any of the valves it had contracted to buy from the defendant. In the course of investigating whether the defendant was entitled to keep the progress payment, the DOD requested proof that the defendant's subcontractor had been paid for manufacturing the parts in question. Elkin supplied his attorney with a letter—later mailed to the DOD—that gave assurances that the subcontractor had been paid. The court found that the letter was proven false and that the letter was "a necessary step in executing the scheme because it was designed to lull the Department of Defense into believing that the progress payment had been properly made." 731 F.2d at 1008 (internal quotation marks and citations omitted). Unlike the letter in *Elkin*, the Kerik's fax was not directed at his victim, and it was transmitted only after officials were investigating Kerik's wrongful conduct. Although the line between lulling and covering-up may not be clearly demarcated, the Court nevertheless determines that no reasonable juror could find that Kerik's fax was sent in furtherance of the alleged scheme to defraud.

[18] 18 U.S.C. § 1001 provides, in pertinent part:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    (2) makes any materially false, fictitious, or fraudulent statement or representation; or

    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or . . . both.

ambiguous, however, it cannot be the predicate of a false statement, regardless of the answer given. *Cf. United States v. Watts*, 72 F. Supp. 2d 106, 109 (E.D.N.Y. 1999) (an answer to a fundamentally ambiguous question "may not, as a matter of law, form the basis of a prosecution for perjury or false statement" under 18 U.S.C. § 1014). This proscription holds even where the answer is unquestionably false or fraudulent. The determination of fundamental ambiguity is a question of law. *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986).

In this Circuit, "[a] question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Lighte*, 782 F.2d at 375 (quoting *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C. 1955)). Of course, "to precisely define the point at which a question becomes fundamentally ambiguous, and thus not amenable to jury interpretation, is impossible." *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998).

Kerik argues that Count Twelve and the first question underlying Count Fourteen should be dismissed because each is based on impermissibly ambiguous questions. These Counts generally charge Kerik's failure to disclose information (including his association with XYZ) that might be embarrassing to him, his family, or the President of the United States, in violation of 18 U.S.C. § 1001.[19] Kerik argues that the veracity of his answers to questions about

---

[19] Count Twelve includes three alleged misrepresentations that Kerik supplied to federal officials while seeking memberships in the Academe & Policy Research Senior Advisory Committee to the White House Office of Homeland Security. Specifically, on October 29, 2002, when asked whether there was anything embarrassing that he [Kerik] wouldn't want the public to know about, Kerik told a White House official, "Nope! It's all in my book." Subsequently, on December 19, 2002, Kerik responded to a Personal Data Statement Questionnaire from the Office of Counsel to the President. In his responses, when asked whether he or his spouse ever had any association with any person, group, or business venture that could be used, even unfairly, to impugn or attack his character and qualifications for a government position, Kerik stated, "No questionable business affiliations." Similarly, when asked whether there was any other information, including information about other members of his family, that could be considered a possible source of embarrassment to him, his family, or the President, Kerik stated, "Not to my knowledge." Sup. Indict. ¶ 45 (accompanying chart).

"embarrassment" cannot, as a matter of law, be assessed objectively.  Such a determination,

Kerik reasons, would require the jury to grapple with how he understood the questions that

prompted his responses.[20]

In response, the Government disputes Kerik's characterization that the questions in

Counts Twelve and Fourteen are fundamentally ambiguous.  The Government contends that the

questions can be understood by looking at the context of the examination and the questioner, and

it notes that such questions are routinely asked of prospective executive branch employees.  In

this case, the Government argues, the jury should be charged "to determine the reasonable

meaning of the relevant question and the truthfulness of the defendant's response."  Opp., pp. 65-

66.

At the outset, the Court notes that only questions one and three from Count Twelve

employ the term "embarrassing".  After considering the factors set forth in *Lighte*, the Court

concludes that the remaining false statement charges in the Superseding Indictment are

permissible.  In Count Fourteen Kerik was specifically asked about his relationships with John

Doe #3 and XYZ and whether those relationships might raise any concern for the President.  The

question explicitly directs Kerik's attention to John Doe #3 and XYZ, leaving little, if any,

ambiguity in the scope of the inquiry.[21]  Similarly, question two from Count Twelve focuses on

---

Question one from Count Fourteen was asked while Kerik was being considered for the position of Secretary of the United States Department of Homeland Security in late 2004.  Sup. Indict. ¶ 50.  When asked whether there was any possible concern the President should have about Kerik's relationship with John Doe #3 or XYZ, Kerik told a White House official that there was none.  Sup. Indict. ¶ 51 (accompanying chart).

[20] Insofar as Kerik argues that submission of these Counts to the jury is impermissible because the jury must surmise Kerik's subjective understanding of the questions, that argument is foreclosed by *Lighte*.  782 F.2d at 372 ("How a defendant interprets a question obviously is not viewed subjectively, as that would compel the jury to accept as conclusive the meaning a defendant alleges he gave to the stated question, and no perjury prosecutions would ever result in convictions.  The test is therefore an objective one.  The jury should determine whether the question—as the declarant must have understood it, giving it a reasonable reading—was falsely answered.").

[21] Alternatively, Kerik argues that this charge should be dismissed because the question required him to engage in speculation (*i.e.*, to ask himself what might embarrass the President).  Speculation, Kerik argues, cannot be proven false, and therefore cannot constitute the basis for a false statement.  Here, Kerik reaches too far.  The speculation,

personal or business associations that might be used to impugn or attack Kerik's character and qualifications for a government position.  While not as specific as question one from Count Fourteen, this query limits the scope of Kerik's answer to "associations" that might impugn his character or qualification.  Such questions are not impermissibly vague.

Plainly the meaning of the term "embarrassing", at least as used in the Superseding Indictment, is open to interpretation.  What is embarrassing to one person may not be embarrassing to the next.  If an individual withheld some innocuous but potentially embarrassing secret—such as one's contentious divorce or one's prescription medication—it is hard to believe that a federal prosecution would follow.  But prosecutorial discretion is not the question here.  The salient question—and it is a close one—is whether these questions are sufficiently clear to be placed before a jury.

Helpfully, the same objection Kerik now asserts was raised by the defendant in *United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998).  Henry Cisneros, the former Secretary of Housing and Urban Development, was indicted for making false statements to federal officials in connection with his nomination to the cabinet post.  When Cisneros was asked whether there was "anything" in his "personal life that could be used by someone to coerce or blackmail" him and whether there was anything "that could cause an embarrassment to [him] or to the President if publicly known," Cisneros replied that "that there was no basis upon which he would be subject to coercion or blackmail."  26 F. Supp. 2d at 32, 41.  At that time, Cisneros was allegedly making payments to his former mistress in order to ensure her public silence about the extramarital affair and his previous payments to her.  *Id*. at 32.  Cisneros moved to dismiss the

---

if any, is slight, and a juror can reasonably assess what Kerik was (or should have been) thinking about when answering whether his associations with John Doe #3 and XYZ might bring embarrassment to the President.  The case law Kerik cites, involving a respondent's answers to *hypothetical* questions, is not apposite or persuasive in the context of speculative questioning.  *See United States v. Carey*, 152 F. Supp. 2d 415, 424 (S.D.N.Y. 2001).

false statement charge because the terms "coerce," "blackmail," and "embarrassment" were vague and ambiguous.  The district court declined to dismiss the charges for vagueness, holding that "[t]he meaning of Cisneros' statements is a matter that is within the province of a jury to determine."  *Id.* at 42.[22]

Considering the guidance from *Cisneros*, this Court agrees that the term "embarrassing" is not fundamentally ambiguous *per se*.  For example, a question about "embarrassing educational history" or "embarrassing business dealings" would not be fundamentally ambiguous because it provides the answerer with clarity about the specific information sought by his examiner.  Moreover, in the context in which questions were asked of Kerik—the vetting process for a high-level executive position—the participants shared a mutual understanding that the questioner sought general information that might be publicly and politically damaging to the nominee or the President.  *See Lighte*, 782 F.2d at 373 ("The jury may also consider extrinsic evidence that demonstrates how a declarant interpreted a question.").  Nevertheless, as a question becomes more abstract, such mutual understanding becomes more tenuous and ambiguity swells.

With these principles in mind, the Court is troubled by questions one and three from Count Twelve.  On October 29, 2002, Kerik was asked whether there was anything embarrassing that he would not want the public to know about.  In contrast to the questions above, this level of abstraction renders the term "embarrassing" fundamentally ambiguous.  The question does not explicitly limit the context to "associations" or specific affiliations.  Rather, the question is more

---

[22] Kerik's approach to distinguishing *Cisneros* is unpersuasive.  Kerik argues that the *Cisneros* court did not have occasion to address the ambiguity of the question because Cisneros's answer—"that there was no basis upon which he would be subject to coercion or blackmail"—could be analyzed irrespective of the question that prompted it.  But even if Kerik's characterization is correct, it does not follow that the court did not consider the ambiguity inherent in the question posed.  Indeed, Cisneros's objection was directed at the ambiguity of the question and, as explained above, the veracity of an answer is inconsequential when responding to a fundamentally ambiguous question.  Therefore, this Court has no reason to believe that the *Cisneros* court failed to consider whether the term "embarrassing" was fundamentally ambiguous.

like a fishing expedition, seeking *anything* that might embarrass an applicant.  Despite the laundry list of answers the Government wishes Kerik would have supplied, it does not follow that Kerik necessarily understood the question in precisely this way.[23]  Question three from Count Twelve provides no greater clarity.  Thus, the Court finds that these two questions are fundamentally ambiguous and may not serve as predicates for the false statement charges in the Superseding Indictment.[24]

### d.  Misjoinder Under Rule 8(a)

The Federal Rules of Criminal Procedure allow for the joinder, in one indictment, of two or more offenses that are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  FED. R. CRIM. P. 8(a); *United States v. Stewart*, 433 F.3d 273, 314 (2d Cir. 2006) (joined offenses may be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme") (internal quotation marks omitted).  In reviewing the propriety of joinder, courts "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper

---

[23] To give a complete and truthful answer to this question, the Government argues that Kerik should have disclosed: "(1) his relationship with John Doe #1, John Doe #2, and John Doe #3; (2) the secret, illicit benefits he received from John Doe #1, John Doe #2, and XYZ; (3) the fact that he failed to disclose those benefits as required on financial disclosure forms he was required to file with the City and that he had committed a crime by failing to make those disclosures on those forms; (4) the steps he took as a public official on behalf of John Doe #1, John Doe #2, and XYZ with City regulators; (5) the fact that he had failed to disclose as required the loan he had received from John Doe #6 on financial disclosure forms he was required to file with the City and that he had committed a crime by failing to make that disclosure on those forms; (6) the fact that he had filed a false loan application with a federally insured bank wherein he had made several false statements relating to the John Doe #6 loan and that he had committed a crime by doing so; and (7) the fact that he had committed federal income tax fraud in connection with the preparation, subscription, and filing of his 2000 and 2001 tax returns."  Opp., p. 59.

[24] The Court acknowledges that the charges in Count Twelve are strikingly similar to those questions permitted in *Cisneros*.  *See* 26 F. Supp. 2d at 45 ("Is there anything in your personal life that could be used by someone to coerce or blackmail you?  Is there anything in your life that could cause an embarrassment to you or to the President if publicly known?  Is so, please provide full details.").  Nevertheless, resolution of this issue must be done on a case-by-case basis.  The *Cisneros* court spent the overwhelming bulk of its analysis on the terms "coerce" and "blackmail", and rightly so given the facts of that case.  However, the false statement charges against Kerik are cloaked only in terms of "embarrassment", and, absent any further clarifying context, those questions are impermissible as a matter of law.

notwithstanding the possibility of prejudice to . . . the defendant[] resulting from the joinder."
*United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (internal quotation marks omitted).
"[C]ounts might be 'connected' if one of the offenses 'depends upon or necessarily leads to the
commission of the other,' or if proof of one act 'constitutes or depends upon proof of the other.'"
*Id*. (quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978)) (internal stylistic changes
omitted).

As the beginning of this Opinion and Order makes clear, the Government has cobbled
together in the Superseding Indictment a laundry list of illegal schemes and false statements
made over the span of eight years.  The charges are not related to all others by time, actors,
places, or subject matter.  The lone common link is Kerik himself, like an unpleasant episode of
*This Is Your Life*.  Nevertheless, the Government argues that joinder is appropriate because the
charges all involve similar kinds of "substantially alleged dishonesty."  *See United States v. Ruiz*,
894 F.2d 501, 505 (2d Cir. 1990).[25]  Relying on Rule 8's "similar character" prong, the
Government categorizes the charges as falling into two types of crimes:  (1) a species of fraud or
(2) a species of false statement.  Opp., p. 73.  But beyond the broad mantra of "dishonesty,"
Kerik's alleged conspiracy to defraud New York citizens of his honest services has nothing to do
with, for example, his alleged failure to withhold payroll taxes from his nanny.  Indeed, the fact
that the Government needed 27 pages in its brief to string together the charges highlights the
tenuous relationship between counts in the Superseding Indictment.

---

[25] In *Ruiz*, the court held that the false statement and perjury charges were "part of a common scheme or plan," and
then noted that because "as all involved substantial alleged dishonesty, surely they were 'of the same or similar
character.'"  894 F.2d at 505.  The Government cites this latter phrase throughout its memorandum of law, but this
horse can be ridden only so far.  The charges joined in *Ruiz* were more closely related than those here.  Ruiz, a
state senator, was charged with perjury and false statements on a loan application and all facts in that indictment
arose out of his extra-senatorial business dealings with a non-profit company called Alliance for Progress, Inc.  As
another court clarified, "[i]n *Ruiz*, the counts were connected because they all related either to his consulting for
or investing in Alliance or to his attempt to conceal the fact that those activities might be illegal."  *United States v.
Bezmalinovic*, No. S3 96 Cr. 97, 1996 WL 737037, at *4 (S.D.N.Y. Dec. 26, 1996).

Neither the Government's "daisy chain" of charges—linking one offense to the next, through common laws or facts, until all charges are included—nor its broad motif of "similar kinds of substantially alleged dishonesty" is sufficient to attain joinder of these charges. *See Shellef*, 507 F.3d at 100 ("We do not think, then, that the 1999 Tax Count—which might have been joined with *either* the 1996 Tax Counts *or* the [non-tax] counts—provides an adequate link between the 1996 Tax Counts and the non-tax counts to justify joinder of all the charges against Shellef."); *see also United States v. Buchanan*, 930 F. Supp. 657, 662 (D. Mass. 1996) ("A vague thematic connection among offenses may not support joinder.  The government cannot link cases simply be changing the level of abstraction—namely that this case is about an abuse of trust, rather than about two distinct allegedly illegal schemes."); *United States v. Bezmalinovic*, No. S3 96 Cr. 97, 1996 WL 737037, at *3 (S.D.N.Y. Dec. 26, 1996) ("The government's broad argument that in all the offenses charged, Bezmalinovic used fraud to achieve his goal of obtaining money, is true of a great number of crimes, not all of which are of a 'similar character' to each other within the meaning of Rule 8(a).").  The Government's other arguments in support of joinder are similarly unavailing.

Even if joinder were otherwise proper, Kerik would be entitled to severance under Rule 14.  When totally unrelated offenses are joined, a defendant faces a considerable risk of substantial prejudice.  For example, in opposing the present motion, the Government characterized Kerik's activities as "*an extensive crime spree*, one that lasted from in or about 1998 until 2006 when [Kerik] ultimately pleaded guilty to related charges in state court that encompassed official corruption, tax fraud, and a web of repeated lies and deceit."  Opp., pp. 1-2 (emphasis supplied).  Frankly, that is a reasonable implication from the fifteen-count Superseding Indictment, and the suggestion of some "criminal disposition" by Kerik would

result in impermissible prejudice requiring severance.  Thus, the Court concludes that the

Superseding Indictment suffers from misjoinder, and, in the alternative, prejudicial joinder.

Unmistakably, honest services fraud is the anchor charge in the Superseding Indictment.

All other counts that share a similar character, or are based on the same act or transactions, or are

connected with or constitute parts of a common scheme or plan to commit honest services fraud

are properly joined.  *See Shellef*, 507 F.3d at 87-88 ("Joinder of tax charges with non-tax charges

under Rule 8 is therefore permissible if 'the tax offenses arose directly from the other offenses

charged,' such as when the funds derived from the acts underlying the non-tax charges 'either are

or produce the unreported income' that is the basis for the tax charges.") (quoting *United States

v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988)); *United States v. Bibby*, 752 F.2d 1116, 1121

(6th Cir. 1985) (finding that tax charges unrelated to conspiracy charge were misjoined, even

though other tax charges relating to the conspiracy were proper joined).  Specifically, the

following charges may be joined:  Count One, Count Two, paragraph 29(a) from Count Four,

Count Five, Count Twelve, Count Fourteen, and Count Fifteen.[26]  The remaining counts may be

brought in a separate proceeding.[27]

---

[26] Furthermore, Kerik's application to sever Counts Fourteen and Fifteen from this prosecution is granted on venue grounds.  Those charges may be filed in the appropriate forum, namely the District of Columbia.

[27] Before releasing this written opinion, the Court announced its rulings from the bench on March 23, 2009.  The Government subsequently sought reconsideration of the Court's decision to sever Count Ten from the remaining charges.  The Court granted the parties permission to brief this discrete issue prior to the publication of this opinion.  The applicable standard for a reconsideration motion in a criminal case is the same as the civil standard under Rule 6.3 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York.  *United States v. Yannotti*, 457 F. Supp. 2d 385, 388-89 (S.D.N.Y. 2006).  Having considered the parties' submissions, the Government's motion for reconsideration is denied.  The Government's second presentation—though more focused and persuasive than its argument on pages 94 and 95 of the original opposition brief—raises neither matters nor controlling decisions which the Court overlooked in reaching its initial disposition.  The reconsideration brief was simply more compelling.  But "[w]here the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion . . . the motion for reconsideration must be denied."  *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008).  Disagreement with this Court's ruling is the basis for appeal, but not for reconsideration.  *Faulkner v. National Geographic Soc'y*, 296 F. Supp. 2d 488, 490 (S.D.N.Y. 2003).

### e.   Other Discovery Requests

Kerik seeks additional discovery and an evidentiary hearing related to the Government's interactions with his former attorney, Mr. Tacopina.  However, Kerik has failed to identify, or even allege, new evidence that the Government engaged in some impermissible practice which might warrant further discovery (*e.g.*, asking Mr. Tacopina to disclose privileged client confidences).  Consequently, Kerik's request for supplemental discovery is denied for the reasons set forth in this Court's Memorandum Decision and Order dated January 23, 2008. *United States v. Kerik*, 531 F. Supp. 2d 610, 617-18 (S.D.N.Y. 2008).

Kerik also requests that the Government provide a full bill of particulars under Rule 7(f).[28]  The decision to grant a bill of particulars rests within the "sound discretion of the district court," *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), and, as this Court noted in *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516 (S.D.N.Y. 2007), "[a] bill of particulars is not an investigative tool, or a tool of discovery, but rather is meant to apprise the defendant of the essential facts of a crime and should be required only where the charges of an indictment are so general that they do not advise a defendant of the specific acts of which he is accused." 520 F. Supp. 2d at 521-22 (internal quotation marks omitted).  As the defendant must concede, the particularity of charges against Kerik improved in the Superseding Indictment, and, in the Court's view, the Government has given Kerik all the details he needs to prepare for trial, subject to its *Brady*, *Giglio*, and section 3500 disclosures due at a later date.  "The prosecution need not particularize all of its evidence." *Davidoff*, 845 F.2d at 1154.  Therefore, Kerik's request for a bill of particulars is denied, although the Court will entertain a subsequent request for particulars upon a greater showing from the defendant.

---

[28] Specifically, Kerik seeks particulars on the "concealment" allegations in paragraph 20 of Count One.  *See* Mem., pp. 80-81.  As noted above, the Court declined to address in dicta the legal sufficiency of these allegations in the Superseding Indictment.  *See* note 13, *supra*.

### III.   Conclusion

For the reasons set forth in this Opinion and Order, the Court holds:

1. The defendant's motion to dismiss Counts One, Two, and Three for failure to state a claim for honest services fraud is denied.

2. The defendant's motion to dismiss Count One (Conspiracy) as barred by the statute of limitations is denied.

3. The defendant's motion to dismiss Count Two (Mail Fraud) as barred by the statute of limitations is denied.

4. The defendant's motion to dismiss Count Three (Wire Fraud) as barred by the statute of limitations is granted.

5. The defendant's motion to dismiss Count Twelve and question one from Count Fourteen is granted in part and denied in part.  Specifically, questions one and three from Count Twelve are based on fundamentally ambiguous questions and are dismissed.  Question two from Count Twelve and question one from Count Fourteen may serve as predicates for the false statement charges.

6. The defendant's motion for severance is granted.  Count One, Count Two, paragraph 29(a) from Count Four, Count Five, Count Twelve, Count Fourteen, and Count Fifteen may be joined.  Moreover, the defendant's motion to sever Counts Fourteen and Fifteen on venue grounds is granted.  The Government's motion for reconsideration of severance of Count Ten is denied.

7. The defendant's remaining requests for additional discovery are denied.

*It is so ordered.*

Dated: White Plains, New York

May 13                , 2009

Stephen C. Robinson
United States District Judge

-28-